Kathleen M. WINN, an Arizona taxpayer, et al., Plaintiffs,

v.

J. Elliot HIBBS, in his official capacity as Director of the Arizona Department of Revenue, et al., Defendants.

No. CIV. 00–0287–PHXEHC.

United States District Court, D. Arizona.

March 25, 2005.

Marvin S. Cohen, Isabel Mary Humphrey, Sacks Tierney PA, Scottsdale, AZ, for Plaintiffs.

Richard Bellah, Bellah Harrian & Pearson, Glendale, AZ, Patrick Irvine, Office of the Attorney General, Frank J. Conti, Jr., Clint Daniel Bolick, Timothy David Keller, Institute for Justice Arizona Chapter, Phoenix, AZ, for Defendants.

**ORDER**

CARROLL, District Judge.

Intervenor–Defendant Arizona Christian School Tuition Organization (ACSTO) filed a Motion to Intervene [Dk. 64], which is unopposed. Defendants Arizona School Choice Trust, Glenn Dennard, and Luis Moscoso (collectively "ASCT") filed a Motion to Dismiss [Dk. 71]. Defendant Hibbs filed a Motion for Judgment on the Pleadings [Dk. 72]. ACSTO filed a Motion to Dismiss [Dk. 73]. Plaintiffs responded to the Motions to Dismiss and Motion for

Judgment on the Pleadings.[1] ASCT replied.[2] Defendant Hibbs replied [Dk. 77].

### Procedural History

This case was filed on February 15, 2000. The Court dismissed for lack of subject matter jurisdiction based on the Tax Injunction Act and principles of comity on February 27, 2001 [Dk. 36]. The Ninth Circuit reversed on both of these grounds and remanded. *Winn v. Killian,* 307 F.3d 1011 (9th Cir. Oct.3, 2002), *reh'g denied,* 321 F.3d 911 (9th Cir.2003). The Supreme Court granted certiorari, *Hibbs v. Winn,* 539 U.S. 986, 124 S.Ct. 45, 156 L.Ed.2d 703 (2003), and affirmed, holding that the Tax Injunction Act did not bar Plaintiff's suit. 542 U.S. 88, 124 S.Ct. 2276, 159 L.Ed.2d 172 (2004).

### Plaintiffs' Complaint

Plaintiffs challenge the constitutionality of A.R.S. § 43–1089[3] ("Tuition Tax Credit") under the First and Fourteenth Amendments. The Tuition Tax Credit allows Arizona income taxpayers who voluntarily contribute money to a "student tuition organization" (STO) to receive a dollar-for-dollar tax credit up to $500 of their annual tax liability.[4] A.R.S. § 43–1089(A)(1). Thus, Arizona taxpayers who know about the Tuition Tax Credit can effectively choose whether $500 of their tax liability goes to the State or to an STO. A.R.S. § 43–1089(A). No limit is placed on the number of taxpayers who use the Tuition Tax Credit. *Id.* In addi-tion, the Tax Credit is available to all taxpayers, regardless of whether they have children in school or have incurred any educational expenses. *Id.* Taxpayers may earmark their donations for specific children who are not their dependants. A.R.S. § 43–1089(D).

An STO is a charitable organization exempt from federal taxation under I.R.C. § 501(c)(3). A.R.S. § 43–1089(F)(3). Each STO uses taxpayers' voluntary cash contributions to provide scholarships and tuition grants to students attending the "qualified schools" with which the STO is affiliated. A "qualified school" is, essentially, a private school, defined in the statute as a "nongovernmental primary or secondary school or a preschool for handicapped students that is located in this state, that does not discriminate on the basis of race, color, handicap, familial status or national origin" and that satisfies Arizona's requirements for private schools. A.R.S. § 43–1089(F)(2).

An STO must use at least 90% of the donations received from taxpayers for scholarships or tuition grants to children "to allow them to attend any qualified school of their parents' choice." A.R.S. § 43–1089(F)(3). While this restriction could be read to require each STO to give scholarships to students for use at any private school in the state, the STOs in practice have designated their own list of private schools at which the scholarship money must be used. However, an STO may not award scholarships to students who are all at the same school. *Id.*[5]

---

1. Plaintiffs lodged the Response to these Motions on October 29, 2004, which was not docketed pending the Court's ruling (*infra*) on Plaintiffs' Motion for Leave to Exceed Page Limits [Dk. 74].

2. The reply is file-stamped November 15, 2004, but was placed undocketed on the left side of the file.

3. The statute was enacted in 1997. Minor amendments which are immaterial to this case have since been made [Dk. 72 at 2]. The Court cites the current version of the statute in this Order.

4. The tax credit is $625 for married taxpayers filing jointly. A.R.S. § 43–1089(A)(2).

5. For example, a private school could not set up an affiliated STO serving only that school so that contributing parents could effectively lower each other's tuition by $500. However, two or more schools are permitted to form an STO to achieve this same end.

Plaintiffs allege that the largest STOs are religious organizations that restrict their donations to private religious schools which in turn use these funds to promote religious education and worship. In 1998, at least $1.7 million out of $1.8 million (94%) of taxpayer donations to STOs went to STOs that restricted scholarships to students attending religious schools. For example, the three largest STOs, which included ACSTO, received 85% of total STO donations in 1998. Each of these STOs restricted the disbursement of scholarship funds to private religious schools. In 2003, according to the Arizona Department of Revenue, there were 51 STOs. Forty-seven of these STOs which reported their donations received a total of $29.1 million [Dk. 71, Att. 2]. Plaintiffs estimate that at least $22.6 million (78% of the total donations) went to STOs which offered scholarships that could only be used at religious schools [Plaintiffs' Response]; that at least $22.2 million of the total donations (91%) went to students attending religious schools; and that, through 2003, STOs have received $113.3 million that otherwise would have gone to the State. *Id.*

Plaintiffs argue that because most STOs are religious organizations that restrict grants to religious schools, parents who wish to send their children to a non-religious private school may be unable to find an STO that is willing to make a tuition grant to a non-religious private school. Plaintiffs allege that the Tuition Tax Credit as applied allows state revenues to fund education in a religiously preferential manner in violation of the Constitution. Plaintiffs seek preliminary and permanent injunctive relief, a declaratory judgment that § 43–1089, on its face and as applied, violates the First and Fourteenth Amendments, and that STOs which make tuition grants for schools of only one religious denomination must return grants to the State of Arizona general fund.

### The Motions to Dismiss and Motion for Judgment on the Pleadings

ASCT raises three arguments in the Motion to Dismiss: first, that Plaintiffs lack taxpayer standing under the Establishment Clause; second, that Plaintiffs fail to state a claim upon which relief can be granted in light of the Supreme Court's decision in *Zelman v. Simmons–Harris*, 536 U.S. 639, 122 S.Ct. 2460, 153 L.Ed.2d 604 (2002); and third, that Plaintiff's claims were decided by the Arizona Supreme Court in *Kotterman v. Killian*, 193 Ariz. 273, 972 P.2d 606 (1999), and are therefore barred by the doctrine of res judicata [Dk. 71]. Defendant Hibbs, in his Motion for Judgment on the Pleadings, discusses *Zelman* and res judicata [Dk. 72]. ACSTO, in its Motion to Dismiss, discusses standing, res judicata, and the test set forth in *Lemon v. Kurtzman*, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971) [Dk. 73]. If the Court assumes that Plaintiffs have standing and that the case is not barred by res judicata, Plaintiffs have failed to state a claim under the Establishment Clause.

### Failure to State an Establishment Clause Claim under *Zelman*

Defendants argue that Plaintiffs fail to state a claim upon which relief can be granted in light of the Supreme Court's decision in *Zelman v. Simmons–Harris*, 536 U.S. 639, 122 S.Ct. 2460, 153 L.Ed.2d 604 (2002). In *Zelman*, the Supreme Court considered Ohio's Pilot Project Scholarship Program ("Cleveland program"), which provided financial assistance to any Ohio School District which was "under a federal court order requiring supervision and operational management of the district by the state superintendent." 536 U.S. at 644, 122 S.Ct. at 2463. The Cleveland City School District was Ohio's only school district in this category. 536 U.S. at 645, 122 S.Ct. at 2463.

The Cleveland program provided tuition aid for students to attend a participating public or private school of their parents' choosing. Students remaining in public schools were eligible for tutorial aid. *Id.* Participating private schools were not permitted to discriminate on the basis of religion. *Id.* Tuition aid was distributed according to financial need. 536 U.S. at 646, 122 S.Ct. at 2464. Over 3,700 students received tuition aid from the Cleveland program, and 96% of these students enrolled in religiously affiliated schools. 536 U.S. at 647, 122 S.Ct. at 2464. Sixty percent of these students came from families at or below the poverty line. *Id.*

 The Supreme Court held that the Establishment Clause "prevents a State from enacting laws that have the purpose or effect of advancing or inhibiting religion." 536 U.S. at 648–49, 122 S.Ct. at 2465 (citation and internal quotation marks omitted). Although the government may not provide aid directly to religious schools, "programs of true private choice, in which government aid reaches religious schools only as a result of the genuine and independent choices of private individuals," do not violate the Establishment Clause. 536 U.S. at 649, 122 S.Ct. at 2465.

1. *Secular Purpose of the Tuition Tax Credit*

 A "plausible secular purpose" for the Tuition Tax Credit "may be discerned from the face of the statute." *Mueller v. Allen,* 463 U.S. 388, 395, 103 S.Ct. 3062, 3067, 77 L.Ed.2d 721 (1983). The Tuition Tax Credit on its face does not mention religion but is instead part of a secular state policy to maximize parents' choices as to where they send their children to

school. *Kotterman,* 193 Ariz. at 278, 972 P.2d at 611. Public school districts in Arizona may not charge tuition and must provide for open enrollment. A.R.S. § 15–816.01(A); *Kotterman,* 193 Ariz. at 283, 972 P.2d at 616. Arizona has established charter schools in order to "provide additional academic choices for parents and pupils." A.R.S. § 15–181 (1994). Charter schools are public schools that do not charge tuition.[6] Arizona provides another tax credit, approved on the same day as the Tuition Tax Credit, that only benefits public schools. A.R.S. § 43–1089.01. As amended, this tax credit allows any Arizona taxpayer to receive up to a $200 tax credit[7] for fees paid or cash contributions made to public schools for extracurricular activities or character education. *Id.* Finally, Arizona has a permissive home-schooling policy. A.R.S. § 15–802 (authorizing education at home-school); A.R.S. § 15–803 (excepting home-schooled students from mandatory public school attendance); A.R.S. § 15–745 (excepting home-schooled students from testing while they are receiving home school instruction).

2. *Programs of True Private Choice*

The Tuition Tax Credit is a program of "true private choice." *Zelman,* 536 U.S. at 649, 122 S.Ct. at 2465. The benefits of the Tuition Tax Credit are available to a broad spectrum of groups; money which would otherwise go to the State can only go to religious schools after being filtered through multiple layers of private choice; and recipients of STO funds still have financial incentives to attend public schools. Indeed, Arizona has given its schoolchildren a range of educational choices consis-

---

**6.** Arizona has 348 charter schools in operation. Arizona State Board for Charter Schools, Charter Summary Report, http://www.asbcs.state.az.us/asbcs/Charter-Summary.asp (last visited March 23, 2005).

**7.** Married tax payers filing jointly can claim a $250 tax credit. A.R.S. § 43–1089.01(A)(2).

tent with a program of true private choice. Therefore, the fact that most donations to STOs have ultimately gone to religious schools does not implicate the Establishment Clause.

First, whether the Tuition Tax Credit is made available to a broad spectrum of groups is "an important index of secular effect." *Zelman*, 536 U.S. at 650, 122 S.Ct. at 2466 (citing *Widmar v. Vincent*, 454 U.S. 263, 274, 102 S.Ct. 269, 277, 70 L.Ed.2d 440 (1981)). Any student in the state, without regard to religion, may apply for and potentially receive an STO scholarship to attend a private school, secular or religious. In fact, the Tuition Tax Credit is available to an even broader spectrum of the public than the Cleveland program in the sense that all Arizona taxpayers, not just parents of students, can use the tax credit to exercise a choice in how their money, which would otherwise be subject to taxes, is spent.

Second, the Tuition Tax Credit provides for multiple layers of private choice such that "government aid [reaches] religious institutions only by way of the deliberate choices of numerous individual recipients." *Zelman*, 536 U.S. at 652, 122 S.Ct. at 2467. In this way, "government cannot, or at least cannot easily, grant special favors that might lead to a religious establishment." 536 U.S. at 652–53, 122 S.Ct. at 2467. The Tuition Tax Credit allows for the private formation of non-profit STOs to raise money for the schools of their choice. Then, taxpayers, if they elect to invoke the tax credit at all, donate to the STO of their choice. Finally, parents choose the school that they want their child to attend and apply for aid from an STO which grants scholarships to that school. Whereas the Cleveland program disbursed government funds to private schools,[8] the Tuition Tax Credit allows funds which the government would otherwise receive to go to the STOs for disbursement, insulating the funds with an additional layer of private choice not present in *Zelman*, 536 U.S. at 646, 122 S.Ct. at 2464.

Third, the Tuition Tax Credit does not provide taxpayers or students financial incentives which are skewed toward religious schools. *Zelman*, 536 U.S. at 653, 122 S.Ct. at 2468. STOs have no financial incentive to fund religious schools over secular ones. Taxpayers have no financial incentive to support STOs which favor religious schools over STOs that do not; indeed, taxpayers have no financial incentive to support any STO at all to the degree that they may not make donations to their own dependants. Nor do parents of students have any skewed financial incentive to send their child to a religious school. An Arizona student may attend any public school in the state without cost, just as the students in *Zelman* could attend community and magnet schools for free. 536 U.S. at 654, 122 S.Ct. at 2468. In contrast, the average scholarship paid by STOs in 2003 for students to attend private schools was $1,222,[9] a sum unlikely to cover all of the costs of private school attendance [Response, Att. 2 at 2].

In *Zelman*, the Court inquired whether the state was coercing parents into sending their children to religious schools by "evaluating *all* options Ohio provides Cleveland schoolchildren." 536 U.S. at 655–56, 122 S.Ct. at 2469 (emphasis in original). Arizona has provided the requisite "range of educational choices," 536 U.S. at 655, 122 S.Ct. at 2469, to parents through its policy of free public education

---

8. The Ohio statute provided for checks to be made directly to parents who then endorsed the checks over to the chosen school. 536 U.S. at 646, 122 S.Ct. at 2464.

9. The average scholarship award in 1998 was $452.

(including open enrollment and the provision of charter schools), tax credit for donations to public school extracurricular activities and character education, and permissive home-schooling policy. The Tuition Tax Credit expands parents' private school options, both secular and religious.

Where the challenged program was neutral toward religion and preserved true private choice, the *Zelman* court did not attach constitutional significance to the amount of state funds ultimately spent on religious education or the number of scholarship recipients enrolled in religious schools. 536 U.S. at 658, 122 S.Ct. at 2470. In Arizona, many (perhaps most) STOs have chosen to support, sometimes exclusively, religious schools; most taxpayers have chosen to support STOs which favor religious schools; most private schools have chosen to incorporate religion into their educational mission; and most STO scholarship recipients have chosen to attend religious schools. These private choices, and there are literally thousands of them, do not implicate the Establishment Clause. *See* U.S. Const. amend. I ("Congress shall make no law respecting an establishment of religion . . .").

Plaintiffs argue that the fact that STOs may elect to disburse scholarship funds based in part on religious affiliation distinguishes this case from *Zelman*. They point out that ASCT, one of the largest STOs that does not disburse its scholar-

ships with any reference to religion, had a waiting list of over 700 people in the Fall of 2004 [Dk. 71, Exh. 3]. In *Zelman*, the Court found it significant that the benefits of the Cleveland program were "available to all families on neutral terms, without reference to religion." 536 U.S. at 653, 122 S.Ct. at 2468. Here, the fact that most STOs fund only religious schools represents a multitude of private choices not implicating the Establishment clause. The Tax Tuition Credit is neutral on its face and as applied; nothing prevents taxpayers from increasing their contributions to existing STOs which provide scholarships to secular private schools or from forming new STOs themselves for that same purpose. *See* 536 U.S. at 658, 122 S.Ct. at 2470 ("The constitutionality of a neutral educational aid program simply does not turn on whether and why, in a particular area, at a particular time, most private schools are run by religious organizations, or most recipients choose to use the aid at a religious school.").[10]

Plaintiffs also argue that the Cleveland program is distinguishable from the Tuition Tax Credit because the former provided vouchers for both public and private schools, whereas the latter only provides assistance to private schools. This distinction is not relevant here. First, the State has a policy, of which the Tuition Tax Credit is only a small part, to maximize parents' educational choices for their children, primarily in the public schools.[11]

---

**10.** The ACST School Quarterly that Plaintiffs cite reported that "[O]ver 700 students are on ASCT's waiting list for scholarships. But that can change! Thanks to the limitless potential of the scholarship tax credit program, we have the opportunity to receive millions in new tax credit donations annually, enough to fund thousands of additional scholarships. Past experience suggests that a dollar spent on marketing the tax credit program will return more than ten dollars in scholarship tax

credit donations" (emphasis in original) [Dk. 71, Exh. 3].

**11.** For example, the State appropriated $2.6 billion to the Department of Education in FY 2002–2003, or 43.5% of the total budget. Arizona Department of Education, Annual Financial Report, State Funding for Education, http://www.ade.state.az.us/annualreport/annualre-port2003/Summary/StateFundEducation.htm (last visited on March 23, 2005).

Second, states may provide assistance to private schools without violating the Establishment Clause. In *Mueller v. Allen*, the Supreme Court held that a Minnesota tax deduction for parents' expenses in providing tuition, textbooks and transportation for their children attending elementary or secondary schools, public or private, did not violate the Establishment Clause. 463 U.S. 388, 103 S.Ct. 3062, 77 L.Ed.2d 721 (1983). The *Mueller* court held that a state may "conclude that there is a strong public interest in assuring the continued financial health of private schools, both sectarian and non-sectarian." 463 U.S. at 395, 103 S.Ct. at 3067.

Third, the Supreme Court's ruling in *Committee For Public Education and Religious Liberty v. Nyquist*, 413 U.S. 756, 93 S.Ct. 2955, 37 L.Ed.2d 948 (1973), is distinguishable from this case. The *Nyquist* court held that a New York program conferring a package of benefits exclusively on private schools and parents of private school enrollees violated the Establishment Clause. However, the *Zelman* court held that "*Nyquist* does not govern neutral educational assistance programs that, like the program here, offer aid directly to a broad class of individual recipients defined without regard to religion." 536 U.S. at 662, 122 S.Ct. at 2472. The Tuition Tax Credit is a neutral, secular program whose benefits are available to all Arizona taxpayers and students. Furthermore, multiple layers of private choice ensure that the State itself does not aid recipients with regard to their religion.

Finally, Plaintiffs argue that the educational crisis precipitating the Cleveland program distinguishes this case from *Zelman*. Indeed, the Supreme Court recognized that the purpose of the Cleveland program was to "assist poor children in failed schools." 536 U.S. at 655, 122 S.Ct. at 2469. In contrast, Defendants have not argued that Arizona schools are failing or

even that the Tuition Tax Credit will primarily benefit the poor. However, Plaintiffs' objections are irrelevant to the constitutional analysis, which only asks whether the program has a valid secular purpose, seeking neither to advance nor inhibit religion. 536 U.S. at 648–649, 122 S.Ct. at 2465; cf. *Am. Jewish Cong. v. Corp. for Nat'l. & Cmty. Serv.*, 399 F.3d 351 (D.C.Cir.2005) (holding that discretionary distribution of government funds to AmeriCorps recipients is permissible under the Establishment Clause, which only requires that government distribute funds neutrally with respect to religion), *rev'g* 323 F.Supp.2d 44 (D.D.C.2004). Arizona's policy of maximizing the choices available to parents is a valid secular purpose; indeed, no useful purpose would be served by making the State wait until its schools were in the same kind of trouble as Cleveland's before implementing a program of true private choice.

Conclusion

The Court, having accepted all allegations in the Complaint as true, finds that Plaintiffs have failed to state a claim under the Establishment Clause.

Accordingly,

**IT IS ORDERED GRANTING** Intervenor–Defendant Arizona Christian School Tuition Organization's Motion to Intervene [Dk. 64].

**IT IS FURTHER ORDERED GRANTING** ASCT's Motion to Dismiss [Dk. 71] without prejudice.

**IT IS FURTHER ORDERED DENYING AS MOOT** Defendant Hibbs' Motion for Judgment on the Pleadings [Dk. 72].

**IT IS FURTHER ORDERED DENYING AS MOOT** ACSTO's Motion to Dismiss [Dk. 73].