United States Court of Appeals
Fifth Circuit

**F I L E D**

**August 15, 2006**

Charles R. Fulbruge III
Clerk

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT
_____

No. 04-20667
_____

KAY STALEY,

Plaintiff - Appellee,

versus

HARRIS COUNTY, TEXAS,

Defendant - Appellant.

_____

Appeals from the United States District Court
for the Southern District of Texas
USDC No. 4:03-CV-3411
_____

Before JOLLY, HIGGINBOTHAM, and SMITH, Circuit Judges.

E. GRADY JOLLY, Circuit Judge:

This appeal raises questions about the constitutionality of a monument, dedicated to a local citizen, located on the grounds of the Harris County Civil Courthouse. The rub is that the monument contains an open Bible. The Plaintiff, Kay Staley, an atheist, argues that the monument violates the Establishment Clause, because its primary purpose and effect are religious. Harris County argues that its purpose and effect are secular -- to memorialize the life of a worthy citizen whose contributions to the community reflect his Christian principles. We hold that although the monument at one time may have passed constitutional scrutiny, its recent history would force an objective observer to conclude that it is a

religious symbol of a particular faith, located on public grounds -- public grounds that may not reflect preference in matters of religion under the Establishment Clause of the First Amendment of the United States Constitution as interpreted and applied by modern day jurisprudence. We therefore affirm the district court's judgment.

I

The Courthouse was built in 1910 and is owned and operated by Harris County, Texas, a political subdivision of the State of Texas.[1] The Courthouse occupies the center of an entire city block in an area of downtown Houston that contains many other county government buildings. Although it originally housed all county and state courts and county government offices, the Courthouse is currently designated as a Civil Courthouse, housing eighteen courts, plus the county and district clerks' offices.

In 1953, the Star of Hope Mission ("Star of Hope"), a local Christian charity that provides food and shelter to indigents, decided to build a memorial to William S. Mosher ("Mosher"), a prominent Houston businessman and philanthropist who had been a long-time, active supporter of Star of Hope before his death in 1948. Carloss Morris ("Morris"), the president of the Star of Hope Mission in 1953, approached the Harris County Commissioners Court and secured permission to erect a memorial to Mosher on the

---

[1] This recitation of the facts is taken largely from the district court's opinion.

Courthouse property.  Morris testified that Star of Hope selected a location in front of the Courthouse because of the permanence and prominence of its location.

Star of Hope designed and paid for the Mosher monument.  It was erected in 1956 in a plaza twenty-one feet from the main entrance to the Courthouse.  The monument measures two feet, six inches by three feet, and is four feet, five inches high.  Engraved on the front surface of the monument, and occupying most of the front surface's area, is the following inscription:

STAR OF HOPE
MISSION

ERECTED
IN LOVING MEMORY
OF
HUSBAND AND FATHER

WILLIAM S. MOSHER

A.D. 1956

The top part of the monument is a glass-topped display case that is sloped towards the Courthouse entrance.  Star of Hope placed an open Bible in the glass display case to memorialize Mosher's Christian faith, although the monument contains no written explanation for the presence of the Bible.[2]  The sloping top of the

---

[2]  Morris testified that one of Star of Hope's purposes for including the open Bible in the display was to convey to the public that Mosher was "a godly man" who had helped others, thus the Bible in the display case was intended to represent Mosher's Christianity.  Morris also testified that the presence of the Bible conveys to people that this is a Christian government.

monument has the appearance of a lectern.  The display case does not contain any other items.  The monument was dedicated in 1956 in a public ceremony, which included Christian prayers.

Because the monument faces the main entrance to the Courthouse, it is readily visible to attorneys, litigants, jurors, witnesses, and other visitors to the Courthouse.  However, a passerby would have to walk up to the monument to observe that it contains a Bible and would have to stand in front of it to read the Bible.  The open Bible as displayed measures twelve by sixteen inches.  The area in which the monument is located contains two wall plaques and two free-standing historical markers.  Neither the plaques nor the historical markers contain any religious message.  No other open books are displayed in or near the Courthouse.  Other monuments, markers, and plaques are present in and near other county buildings, but none of them contain a religious message.

Star of Hope maintained the monument from 1956 to 1995.  The monument was vandalized several times and the Bible stolen.  Star of Hope replaced it each time.  In 1988, atheists complained about the Bible to the Harris County Commissioners Court and asked that it be removed.  Although the evidence on this point is not entirely clear, it appears that Star of Hope decided either to remove the Bible or not to replace it again, rather than face potentially costly litigation.  From 1988 to 1995, the top of the monument remained open and empty, and it was often used as a trash bin.

This state desuetude ended in 1995, when John Devine was elected as a state district judge. Judge Devine campaigned on a platform of putting Christianity back into government. As a judge, he initially maintained his office in a county building near the Courthouse, and later moved to the Courthouse. His official court reporter was Karen Friend. In 1995, Judge Devine and Friend initiated a project to solicit private donations to refurbish the monument, to restore a Bible to the display case, and to add neon lighting to the display case. Judge Devine obtained approval from Harris County, and made improvements to the monument, including the new Bible and a red neon light outlining the Bible. Harris County, however, did not pay for any of the improvements. A ceremony was held on the Courthouse grounds in November 1995 to commemorate the refurbishing of the monument and the replacement of the Bible. A number of Christian ministers led prayers at the rededication ceremony. Spectators and participants sang "The Battle Hymn of the Republic".

In 1996, and again in 1998, Friend paid for repairs to the lights in the display case and to the display case to protect the Bible from moisture. Since 1995, Harris County has paid for electricity at the cost of $93.16 per year to illuminate the neon lights that were installed in 1995. For a few years after the monument was refurbished, Friend periodically turned the pages of the Bible to selected passages. Since 1997, Star of Hope has maintained the monument and turned the pages of the Bible.

5

Although Harris County does not maintain the monument, it retains the authority to move or alter it.

Staley is a resident and taxpayer of Harris County. Staley, an attorney, passes the monument going to and from the Courthouse in the course of her occupation. She testified that she is offended by the Bible display in the monument because it advances Christianity and it sends a message to her and to non-Christians that, because they do not share the Christian faith, they are not full members of the Houston political community.

After Staley filed suit asking that Harris County be ordered to remove the Bible display, supporters of the Bible display held a large rally on September 4, 2003, in the Courthouse plaza next to the monument. Several hundred rally participants prayed and stressed that the Bible was a foundation of the Christian faith.[3] County Judge Robert Eckels, Judge Devine, and Harris County Attorney Mike Stafford spoke at the rally and participated in the

---

[3] News footage of the rally, in which the monument is referred to as the "Bible monument," contains one woman stating that she is ready to die for this, because it is the "essence of Christianity." Further, a granddaughter of Mosher stated that this was more than a battle over a monument, but was a "real battle of good and evil."

prayers led by Christian ministers.[4]  Eckels and Stafford stated

that the County would strongly oppose the lawsuit.[5]

                                    II

    On August 25, 2003, Staley filed suit in the United States

District Court for the Southern District of Texas, requesting a

temporary restraining order, preliminary injunction, and permanent

injunction against Harris County to remove the Bible from the

display case, as well as requesting attorney's fees.  On August 10,

2004, the district court entered a final judgment in favor of

Staley, ordering the Bible removed from the monument, as well as

ordering Harris County to pay Staley $40,586 in attorney's fees and

expenses.  The district court reasoned that the purpose and the

effect of the Bible in the monument casing were religious, thus the

presence of the Bible violated the Establishment Clause.  Harris

County timely appeals the district court's decision.

                                   III

    Harris County maintains that the district court erred in its

determination that the monument violates the Establishment Clause.

First, Harris County argues that the district court erred in

focusing on the Bible as a separate object apart from the Mosher

---

[4]  In the 2004 bench trial, Eckels testified that Mosher's death was "within the last few years."  Judge Devine testified that he was not sure when Mosher died, but guessed 1955.  Judge Devine also testified as to a nebulous understanding of what Mosher did.

[5]  We think this event should have little weight in determining the purpose of the monument since it was largely invited by the lawsuit and was an expected response by adversaries.

memorial in which it is housed. Second, Harris County asserts that the district court erred in finding that the monument had a religious purpose. The county maintains that the purpose of the monument is to honor Mosher and the life that he led. Third, Harris County contends that the district court erred in finding that the monument had a religious effect. It insists that, due to the monument's nonreligious inscription memorializing Mr. Mosher, the reasonable observer would recognize that Star of Hope erected the monument as a private expression and that Harris County did not endorse the included Bible. We need not address Harris County's first and third arguments because we find that the monument as a whole has a predominantly religious purpose, thus running afoul of the Establishment Clause.

IV

A

This Court reviews the district court's grant of a permanent injunction under the abuse of discretion standard. Peaches Entm't Corp. v. Entm't Repertoire Assocs., Inc., 62 F.3d 690, 693 (5th Cir. 1995). We review findings of fact for clear error and conclusions of law de novo. Id. The district court's conclusions of constitutional law are reviewed de novo. Peyote Way Church of God, Inc. v. Thornburgh, 922 F.2d 1210, 1213 (5th Cir. 1991).

To decide the case before us, we see little need to conduct an exhaustive and analytical survey of Establishment Clause jurisprudence over the past fifty, or even the past five, years.

8

The outcome of this case is foretold by the two most recent cases handed down by the Supreme Court in this area of the law, each case dealing with monuments on public grounds, and neither case decided when the district court ruled on this case.[6]  See McCreary County, Ky. v. ACLU of Ky., -- U.S. --, 125 S. Ct. 2722 (2005); Van Orden v. Perry, -- U.S. --, 125 S. Ct. 2854 (2005).

In McCreary County, the Court held that two counties' actions of posting the Ten Commandments in their respective courthouses violated the Establishment Clause.  The counties each put up large, gold-framed copies of the Ten Commandments in their respective courthouses.  McCreary County, 125 S. Ct. at 2728.  In McCreary

---

[6]    Each of these opinions suggests a constitutional determination on the basis of the conclusion of an "objective observer," and McCreary County involves the "purpose" test of Lemon v. Kurtzman, 403 U.S. 602 (1971).  We recognize the criticisms of Lemon noted by Justice Scalia, and in particular his criticisms of the "objective observer" analysis for determining the purpose of the monument.  See McCreary County, Ky. v. ACLU of Ky., -- U.S. --, 125 S. Ct. 2722, 2757 (2005) (Scalia, J., dissenting). Nevertheless, this reasoning is the lodestar illuminating the pathway through the majority opinion in McCreary County, as well as the theme implicit in Justice Breyer's concurrence in Van Orden. Neither leaves any doubt that if the objective observer should conclude from appearances and historic knowledge that the state is demonstrating a religious preference, the Establishment Clause is violated.

We do not argue that our analysis, following the Supreme Court's guide, represents the most scholarly, historical, or convincing method of explaining and applying the Establishment Clause.  Nevertheless, the "objective observer" analysis is both the simple and Supreme Court-approved method of deciding this case: A monument attacked under the Establishment Clause will not pass constitutional scrutiny if the objective observer concludes that the purpose or the effect of the monument advances a religious message demonstrating sectarian preferences.

9

County, the county legislative body issued an order requiring the display to be placed in a very high traffic area, and so it was. Id. In Pulaski County, a ceremony was held at the hanging of the display, which included numerous religious references and a pastor in attendance. Id. In both counties, the display was plainly visible to courthouse visitors. Id. The ACLU sued the counties, and within a month of the lawsuit's filing, "and before the [d]istrict [c]ourt had responded to the request for injunction, the legislative body of each [c]ounty authorized a second, expanded display, by nearly identical resolutions reciting that the Ten Commandments are the 'precedent legal code upon which [Kentucky codified law is] founded,' and stating several grounds for taking that position." Id. at 2729. The expanded displays included the Ten Commandments, as well as eight other documents in smaller frames, all of which had a religious theme or highlighted a religious element. Id. The district court subsequently entered a preliminary injunction ordering these second displays removed, determining that they violated the Establishment Clause. Id. at 2730. The counties "then installed another display in each courthouse, the third within a year. No new resolution authorized this one, nor did the [c]ounties repeal the resolutions that preceded the second." Id. at 2730. The third display contained nine equally-sized framed documents, including a longer version of the Ten Commandments, along with eight other historical and legal documents, some of which contained religious references. Id. at

10

2730-31.  Each document was posted with a statement regarding its historical and legal significance.  Id. at 2731.  The counties explained that the reasons for the display included "desires 'to demonstrate that the Ten Commandments were part of the foundation of American Law and Government' and 'to educate the citizens of the county regarding some of the documents that played a significant role in the foundation of our system of law and government.'" Id.

The case wound its way to the Supreme Court.  Once there, the Court forbade the courthouse displays and, in doing so, refined the purpose prong of the Lemon test.  Id. at 2732-37; see also ACLU of Ky. v. Mercer County, Ky., 432 F.3d 624, 630-32, 635-36 (6th Cir. 2005); Skoros v. City of New York, 437 F.3d 1, 17 (2d Cir. 2006).  The Court noted that "although a legislature's stated reasons will generally get deference, the secular purpose required has to be genuine, not a sham, and not merely secondary to a religious objective."  McCreary County, 125 S. Ct. at 2735.  In the examination of purpose, "[t]he eyes that look to purpose belong to an objective observer, one who takes account of the traditional external signs that show up in the text, legislative history, and implementation of the statute or comparable official act." Id. at 2734 (internal quotations omitted).  This reasonable observer has a reasonable memory, and knows the history and context of the government's actions.  Id. at 2737.  Furthermore, "purpose needs to be taken seriously under the Establishment Clause and needs to be understood in light of context."  Id. at 2741.

11

The Court determined that it must "look to the record of evidence showing the progression leading up to the third display of the Commandments." Id. at 2738. The Court noted that the Ten Commandments are "a central point of reference in the religious and moral history of Jews and Christians[,]" and that the religious message of the Ten Commandments "is hard to avoid in the absence of a context plausibly suggesting a message going beyond an excuse to promote the religious point of view." Id. The Court noted that the first display, consisting of only the Ten Commandments, did nothing to counter the sectarian implication, and further observed that the Pulaski County ceremony was attended by the county executive's pastor, who testified to the certainty of God's existence. Id. The Court remarked that "[t]he reasonable observer could only think that the [c]ounties meant to emphasize and celebrate the Commandments' religious message." Id. As to the first displays, the Court concluded that "the original text [of the Commandments] viewed in its entirety is an unmistakably religious statement dealing with religious obligations and with morality subject to religious sanction[,]" thus "[w]hen the government initiates an effort to place this statement alone in public view, a religious object is unmistakable." Id. at 2739.

As to the second display, the Court observed that the other documents displayed contained the sole common element of highlighted references to God, and that the display's focus was on religious passages, thus demonstrating that the Ten Commandments

12

were posted because of the sectarian content.  Id.  Noting that the counties did not attempt to defend their objective behind the second display, but instead described it as "dead and buried," the Court stated that the "refusal to defend the second display is understandable, but the reasonable observer could not forget it." Id.

Moving on to an examination of the third display, the Court noted that the new statements of purpose attending the display "were presented only as a litigating position, there being no further authorizing action by the [c]ounties' governing boards[,]" that the resolutions for the second display were not repealed, and that more of the purely religious language of the Ten Commandments was quoted than was in the first two displays.  Id. at 2740. According to the Court, "[n]o reasonable observer could swallow the claim that the [c]ounties had cast off the objective so unmistakable in the earlier displays."  Id.  The Court also reasoned that the other posted material did not "suggest a clear theme that might prevail over evidence of the continuing religious object[,]" as several important historical documents, such as the original Constitution and the Fourteenth Amendment were absent, while documents such as patriotic anthems and portions of the Magna Carta were displayed.  Id.  The Court found that this indicated that the reasonable observer "would probably suspect that the [c]ounties were simply reaching for any way to keep a religious document on the walls of courthouses constitutionally required to

13

embody religious neutrality." Id. at 2741. Thus, the Court, in upholding the district court's preliminary injunction, stated that "an implausible claim that governmental purpose has changed should not carry the day in a court of law any more than in a head with common sense." Id. However, the Court qualified the holding, stating that it did "not decide that the [c]ounties' past actions forever taint any effort on their part to deal with the subject matter." Id. Reading the majority opinion in its entirety and attempting to place its observations and holdings in context, we must conclude that it does not bring good news for the defendants in this case.

We now turn to review Van Orden, a case with a more favorable outcome for the defendants. There, a plurality of the Court, in upholding the constitutionality of a Ten Commandments monument on the grounds of the Texas State Capitol, found the Lemon test not useful in dealing with the sort of passive monument at issue in that case, and instead looked to the nature of the monument and our Nation's history.[7] 125 S. Ct. at 2861. The monument in Van Orden

---

[7] The plurality examined the "two directions" in which cases point in applying the Establishment Clause. Van Orden, 125 S. Ct. at 2859. "One face looks toward the strong role played by religion and religious tradition throughout our Nation's history." Id. "The other face looks toward the principle that government intervention in religious matters can itself endanger religious freedom." Id. Both faces should be respected. Id. Noting the longstanding role of the Ten Commandments in the heritage of our country, id. at 2862, and the passive nature of the monument, id. at 2864, the plurality concluded that the monument did not violate the Establishment Clause. Id. at 2864.

14

was located on the twenty-two acres surrounding the Texas State Capitol, an area that contained seventeen monuments and twenty-one historical markers, the presence of which commemorated the "'people, ideals, and events that compose Texan identity.'" Id. at 2858. The monument's primary content consisted of the text of the Ten Commandments, and it also included many smaller symbols, such as the Star of David, and Greek letters representing Christ. Id. The monument bore a prominent inscription that acknowledged that the monument was donated by the Fraternal Order of Eagles, a private social, civic, and patriotic organization. Id. The Eagles "sought to highlight the Commandments' role in shaping civic morality as part of that organization's efforts to combat juvenile delinquency." Id. at 2870 (Breyer, J., concurring). In deciding the text that would be displayed, the Eagles consulted "with a committee composed of members of several faiths in order to find a nonsectarian text." Id. (Breyer, J., concurring). The location of the monument was selected based on the recommendation of the state organization that was responsible for maintaining the Capitol grounds, and the dedication of the monument was presided over by two state legislators, there being no indication of religious-type ceremonies attending this dedication. Id. at 2858. The monument stood for approximately forty years without legal challenge. Id. at 2870 (Breyer, J., concurring).

15

In his concurring opinion agreeing that the monument did not violate the Establishment Clause,[8] Justice Breyer determined that "no single mechanical formula [] can accurately draw the constitutional line in every case." Id. at 2868, 2869 (Breyer, J., concurring) ("While the Court's prior tests provide useful guideposts ... no exact formula can dictate a resolution to such fact-intensive cases." (internal citations omitted)). He found that in borderline cases, there is "no test-related substitute for the exercise of legal judgment[,]" taking into account the context and consequences in light of the underlying purposes of the religion clauses.[9] Id. at 2869 (Breyer, J., concurring). "[T]o determine the message that the text here conveys, we must examine how the text is *used*. And that inquiry requires us to consider the context of the display." Id. (Breyer, J., concurring).

In examining the context of the display to determine the predominant message it conveyed, Justice Breyer looked to several different factors, including the circumstances surrounding the

---

[8]    Justice Breyer's concurrence in Van Orden is the controlling opinion from which we must draw in this case. See Marks v. United States, 430 U.S. 188, 193 (1977) ("When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds." (internal quotations omitted)).

[9]    However, Justice Breyer did note that he believed that the monument might satisfy more formal Establishment Clause tests, as it served a mixed but primarily nonreligious purpose. Van Orden, 125 S. Ct. at 2871 (Breyer, J., concurring).

16

display's placement on state grounds, the display's physical setting, and the amount of time the display stood without challenge. Id. at 2870 (Breyer, J., concurring). Regarding the circumstances surrounding the display's placement, Justice Breyer found it noteworthy that the Eagles sought to highlight the role of the Ten Commandments in shaping civic morality because of the Eagles' efforts combating juvenile delinquency, that the Eagles' attempted to find a nonsectarian text to display, and that the monument acknowledged that it was donated by the Eagles. Id. at 2870 (Breyer, J., concurring). He determined that these facts emphasized the Eagles' ethics-based, secular motive and distanced the State from the religious aspect of the monument's message. Id. (Breyer, J., concurring). Justice Breyer observed that the monument's setting did not lend itself readily to religious activity, but that it did "provide a context of history and moral ideals." Id. (Breyer, J., concurring). Thus, he reasoned that "the context suggests that the State intended the display's moral message--an illustrative message reflecting the historical 'ideals' of Texans--to predominate." Id. (Breyer, J., concurring). Justice Breyer further emphasized that the forty years that had passed without legal objection to the monument strongly suggested that most individuals "considered the religious aspect of the tablets' message as part of what is a broader moral and historical message reflective of cultural heritage." Id. at 2870-71 (Breyer, J., concurring).

Justice Breyer distinguished <u>Van Orden</u> from <u>McCreary County</u>, observing that in <u>McCreary County</u> the history of the displays "demonstrate[d] the substantially religious objectives of those who mounted them, and the effect of this readily apparent objective upon those who view them." <u>Id.</u> at 2871 (Breyer, J., concurring). He stated that "a more contemporary state effort to focus attention upon a religious text is certainly likely to prove divisive in a way that this longstanding, pre-existing monument has not." <u>Id.</u> (Breyer, J., concurring). He concluded that in finding the monument constitutional, he relied "less upon a literal application of any particular test than upon consideration of the basic purposes of the First Amendment's Religion Clauses themselves[,]" specifically, avoiding religiously based divisiveness. <u>Id.</u> (Breyer, J., concurring). Again focusing on the forty years the monument went uncontested, Justice Breyer noted that "as a practical matter of *degree* this display is unlikely to prove divisive. And this matter of degree is ... critical in a borderline case such as this one." <u>Id.</u> (Breyer, J., concurring). He concluded that "where the Establishment Clause is at issue, we must distinguish between real threat and mere shadow. Here, we have only the shadow." <u>Id.</u> (Breyer, J., concurring) (internal citation and quotations omitted).

This Court has stated that the determination of whether a display has the effect of endorsing religion centers around a fair

understanding of the purpose of the display as may be held by viewers. Van Orden v. Perry, 351 F.3d 173, 177 (5th Cir. 2003), aff'd -- U.S. --, 125 S. Ct. 2854 (2005). The viewpoint to be examined is that of a reasonable observer, "not of the uninformed, the casual passerby, the heckler, or the reaction of a single individual." Van Orden, 351 F.3d at 177-78. This Court has stated that "[t]he guiding principle is government neutrality toward religion in the sense that a state cannot favor religion over non-religion or one religion over another[,]" thus the "proper application of First Amendment principles demands a sense of proportion and [the] inquiry is fact-sensitive." Id. at 178.

B

We now turn to an examination of the Mosher monument's purpose, focusing on the viewpoint of the objective observer, a person who is "familiar with the history of the government's actions" and the context in which those actions arose, and "who takes account of the traditional external signs that show up in the text, legislative history, and implementation" of the government's act. McCreary County, 125 S. Ct. at 2734-35, 2737 (internal quotations omitted). McCreary County makes clear that the entire history surrounding the monument is relevant -- a religious purpose cannot be hidden one way or the other. An original religious purpose may not be concealed by later acts, nor may a newfound religious purpose be shielded by reference to an original purpose. In conducting our analysis, we note, as the Court in McCreary

19

County noted regarding the Ten Commandments, that the Bible is a central point of reference in the religious history of Christians. See id. at 2738.

First, we examine the purpose of the monument in 1956, when it was first erected. The evidence is clear and indisputable that Star of Hope erected the monument to honor the life and contributions of Mosher. The Bible was included to represent that Mosher was a Christian, Christianity being an important part of the life being honored. The reasonable observer, cognizant of the history and context of the monument, would know about Mosher, his contributions to Star of Hope, and the importance of Christianity in his life. Thus, although some religious expression and religious values seem to have been behind the erection of the monument, it does not betray sound reasoning to conclude that, from the viewpoint of the objective observer, the primary purpose of the monument originally was to honor the life and contributions of a generous, compassionate, and well-respected citizen whose life reflected the Christian values that inspired his contributions to the community. See Van Orden, 125 S. Ct. at 2869-70 (Breyer, J., concurring) (noting that constitutional religious texts may convey both religious and secular messages). It is certainly true that Christian prayers were included in the dedication ceremony. Nevertheless, the fact that the monument, with the Bible, stood without complaint for thirty-two years, supports the notion that the original purpose was not objectively seen as predominantly

20

religious.  See Van Orden, 125 S. Ct. at 2870-71 (Breyer, J., concurring) (the significant length of time during which the monument stood without objection "suggest[s] more strongly than can any set of formulaic tests that few individuals, whatever their system of beliefs, are likely to have understood the monument as amounting, in any significantly detrimental way, to a government effort to favor" or promote religion).

Another phase of the monument's life began in 1988 with the removal of the Bible from the monument; then there was the absence of any Bible and the neglect of the monument for seven years.  In 1995 there began the final phase with the refurbishment of the monument.  Now this is the point at which the monument begins to morph into a religious symbol, an occurrence that would have been fully noticed by the objective observer.

As we have noted, the monument had been abandoned for seven years when the Bible was replaced in 1995, and the circumstances attending the replacement indicate an almost exclusively religious purpose for the restoration of the monument.  First, the refurbishment of the monument was sparked by Judge Devine shortly after he premised his political campaign on putting Christianity back in government.  Neither Judge Devine nor Friend had any relationship with Mosher, Mosher's family, or Star of Hope.  Any suggestion that the primary concern, or even one significant concern, of Devine and Friend was to honor Mosher is factually baseless.  Second, the "refurbishment" of the monument did more

21

than simply restore the monument to its original form –- the monument was in fact altered, and in ways that are significant to this case. A red neon light surrounding the Bible was added to the monument, highlighting and illuminating the religious portion of the monument, where there had been no such previous focus or emphasis on the Bible. Furthermore, the refurbishment decisions were not made by anyone in a museum curator-type position, but instead all decisions appear to have been made by Friend and/or Judge Devine, whose motivations and interests seem to have been purely religious. Third, the rededication ceremony, which Harris County officials attended, featured several Christian ministers leading prayers. See McCreary County, 125 S. Ct. at 2738 (noting that the presence of a pastor who testified about the certainty of the existence of God was a factor tending to show that the reasonable observer would think that the county was emphasizing and celebrating the religious message of the display); cf. Van Orden, 351 F.3d at 179-80, 181 (no indication of any religious aspect in original dedication ceremony and no indication of any ceremony attending reinstallation).

It is likewise noteworthy that the length of time between the refurbishment of the monument and the legal objection to it is relatively short, hardly spanning generations as did the time period emphasized by Justice Breyer in Van Orden. Furthermore, the 1995 refurbishment is "a more contemporary state effort to focus

22

attention upon a religious text" that is more likely to prove divisive. <u>Van Orden</u>, 125 S. Ct. at 2871 (Breyer, J., concurring).[10]

Based on these events, the reasonable observer would conclude that the monument, with the Bible outlined in red neon lighting, had evolved into a predominantly religious symbol. In examining the distinct third phase of the monument, the objective observer would note the primarily religious purpose attached to the monument. Taking into account Judge Devine's political platform, the lack of connections between the refurbishers of the monument and Mosher or Star of Hope, the religious ceremonies attending the refurbishment, and the addition of a red neon light drawing added attention to the religious portion of the monument, an objective observer would conclude that the monument in its new phase of life had come to have a predominantly religious purpose. This observer would conclude that Judge Devine and his allies essentially had

---

[10] The plaintiff argues that the 2003 rally in support of the monument, occurring after the lawsuit was filed seeking to remove the Bible, demonstrates that the monument has a primary religious purpose. The rally, where Harris County officials attended and spoke, focused almost solely on the display of the Bible. Little was said about Mosher or the monument itself, but the speeches focused on defending the Bible as part of the monument and on the lawsuit that had been filed seeking its removal.

The rally occurred after the lawsuit was filed and adversarial relationships had been established. We therefore find little relevance to this post-litigation conduct, which is influenced by the litigation as opposed to underlying the purpose of the monument. Litigating posturing is suspect in determining the purpose of a monument. <u>See</u> <u>McCreary County</u>, 125 S. Ct. at 2740-41.

23

commandeered the monument for religious purposes, and that the primary purpose of the monument had now become religious.

Because the objective observer would conclude that the current purpose of the monument has evolved into, and presently constitutes, a religious symbol, the Mosher monument containing a Bible violates the Establishment Clause. For the foregoing reasons, the judgment of the district court is

AFFIRMED.

JERRY E. SMITH, Circuit Judge, dissenting:

The panel majority exhibits an appalling hostility to any hint of religion in public spaces. Moreover, it does so by means of a misguided attempt to apply the Supreme Court's recent opinions in *McCreary*[1] and *Van Orden*.[2] The result is to enable a candidate for political office to alter the character and constitutionality of a longstanding, privately-owned memorial merely by invoking religion and making benign alterations to the monument's appearance. The majority bases its indictment of the Mosher memorial not on any legislative resolution or official statement made at its dedication, but instead on the bare *interpretation* of its purpose by state judge John Devine nearly forty years into its existence.

This formerly unknown principle of constitutional lawSSwhich perhaps should be crowned the "Principle of Devine Intervention"SShas serious doctrinal and practical consequences. First, it justifies the removal of a monument having a predominantly secular purpose, *see McCreary*, 125 S. Ct. at 2733, as long as *any* religious purpose arises during the course of the monument's multi-decade lifetime. Second, it places in particular jeopardy those monuments that are most deserving of judicial protection because they have "stood apparently uncontested for . . . generations" and are "unlikely to prove divisive" in the future. *Van Orden*, 125 S. Ct. at 2871 (Breyer, J., concurring). Because this result and reasoning reflect a fundamental misunderstanding of *McCreary* and *Van Orden*, I respectfully dissent.

---

[1] *McCreary County, Ky. v. ACLU*, 125 S. Ct. 2722 (2005).

[2] *Van Orden v. Perry*, 125 S. Ct. 2854 (2005).

25

I.

The panel majority opines that this is not the occasion to develop and apply the most "scholarly, historical, or convincing" approach to Establishment Clause jurisprudence. Irrespective of whether the majority is correct in that assertion, this case does present the occasion, for the first time in this circuit, to integrate *McCreary* and *Van Orden* into as coherent a framework as possible. Despite its desire to appear conflicted over the merits of the "objective observer" test, the majority proceeds to create an observer whose memory is short and whose antipathy to religion lacks any semblance of objectivity. Nothing in *McCreary* or *Van Orden* requires us to exercise the power of judicial review in such a censorial manner.

A.

The *Lemon* test remains the benchmark for reviewing the constitutionality of a monument on public property.[3] The purpose prong of that test, as modified by *McCreary*, 125 S. Ct. at 2733,[4]

---

[3] Though four Justices concluded that the *Lemon* test was "not useful" for evaluating a passive monument on government property, *Van Orden*, 125 S. Ct. at 2861, and a fifth Justice relied "less upon a literal application of any particular test than upon consideration of the basic purposes of the First Amendment's Religion Clauses themselves," *id.* at 2871 (Breyer, J., concurring), the *McCreary* majority opinion assumed the continuing vitality of *Lemon* in its analysis of the purpose of the Kentucky counties' displays. *See McCreary*, 125 S. Ct. at 2732-33.

[4] I agree with Justice Scalia's observation in dissent in *McCreary* that the Court introduced a "heightened requirement that the secular purpose 'predominate' over any purpose to advance religion." *McCreary*, 125 S. Ct. at 2757 (Scalia, J., dissenting). Previously, *Lemon* required only that the government offer a non-sham secular purpose, whether it predominated or not. *See id.* at 2757-58 (Scalia, J., dissenting) (collecting sources).

prohibits government from acting with the "ostensible and predominant purpose of advancing religion." The Court held that we may consider the evolution of a monument when evaluating its purpose, *id.* at 2728, but emphatically rejected the counties' position that purpose should derive solely from the most recent action taken with respect to a particular display:

> [T]he world is not made brand new every morning, and the Counties are simply asking us to ignore perfectly probative evidence; they want an absentminded objective observer, not one presumed to be familiar with the history of the government's actions and competent to learn what history has to show.

*Id.* at 2736-37. The objective observer is not easily persuaded that a newly-articulated purpose should displace a well-settled, original purpose, because "reasonable observers have reasonable memories," *id.* at 2737, and "[n]o reasonable observer could swallow the claim that the Counties had cast off the objective so unmistakable in the earlier displays." *Id.* at 2740.

In *Van Orden*, Justice Breyer, in the controlling opinion, considered the "basic purposes" of the religion clausesSSin his view, preservation of religious liberty and tolerance, the prevention of social conflict that results from religious strife, and the separation of church and stateSSin discerning the effect of a monument on the community. *See Van Orden*, 125 S. Ct. at 2868, 2871 (Breyer, J., concurring). Justice Breyer examined the circumstances surrounding the placement of the Ten Commandments on the state capitol grounds and the physical setting of the monument and concluded that the state intended a moral, non-religious message to predominate. *See id.* at 2870 (Breyer, J., concurring).

Moreover, in *Van Orden* the fact that the monument had survived forty years without legal challenge was determinative:

> [T]hose 40 years suggest more strongly than can any set of formulaic tests that few individuals, whatever their system of beliefs, are likely to have understood the monument as amounting, in any significantly detrimental way, to a government effort to

27

> favor a particular religious sect, primarily to promote religion over nonreligion, to engage in any religious practice, to compel any religious practice, or to work deterrence of any religious belief.

*Id.* (Breyer, J., concurring) (internal quotations omitted). It follows that judicial removal of a long-standing monument would "lead the law to exhibit a hostility toward religion that has no place in our Establishment Clause traditions . . . [and] could thereby create the very kind of religiously based divisiveness that the Establishment Clause seeks to avoid." *Id.* at 2871 (Breyer, J., concurring).

The net effect of *McCreary*'s predominance standard and *Van Orden*'s emphasis on the longevity of the challenged display is to create a presumption that secular monuments of early provenance are constitutional, even if they contain subordinate religious elements.[5] If a monument lacks a "sectarian heritage," *McCreary*, 125 S. Ct. at 2737 n.14, the "objective observer" will be unmoved by an outlier's insistence that the monument was, in fact, intended to promote religion.

The collective wisdom of the community over an extended period of time provides more reliable evidence of the purpose of a public display than do the musings of "the uninformed, the casual passerby, the heckler, or the reaction of a single individual." *Van Orden*, 351 F.3d at 178. The appearance of religious themes in time-honored monuments, like the invocation of God in legislative session, at court arguments, or on our currency, is permissible official recognition of the place occupied by religion in the tapestry of our national culture.[6]

---

[5] *See Van Orden*, 125 S. Ct. at 2871 (comparing the long, peaceful history of the Texas monument with the "short (and stormy) history" of the Kentucky displays).

[6] *See Van Orden*, 125 S. Ct. at 2869 (Breyer, J., concurring) (noting the Establishment Clause's tolerance of "the prayers that open legislative meetings . . . certain references to, and invocations of, the Deity in the public words of public officials; the public references to God on coins, decrees, and buildings; [and] the attention paid to the religious objectives of certain

B.

Although the panel majority likely agrees with much of this analysis, it ultimately undermines the holdings of *McCreary* and *Van Orden* with two analytically dubious maneuvers that make its result possible. First, the majority asserts (without citation) that "a religious purpose cannot be hidden one way or the other" and is invalidating whether it arises early or late in a monument's history. This is demonstrably false. Implicit in the notion that the state may not act with the predominant purpose of advancing religion is that it *may* act with the *secondary* purpose of advancing it.

A religious purpose appearing for the first time nearly forty years after the foundation of a monument can hardly classify as "predominant." *McCreary* lends no support to the proposition that a newfound religious purpose automatically supersedes an original secular one. In *McCreary* the Court explicitly rejects that formulation:

> If someone in the government hides religious motive so well that the objective observer, acquainted with the [history and implementation of the government's action] cannot see it, then without something more the government does not make a divisive announcement that in itself amounts to taking religious sides . . . . [I]t suffices to wait and see whether such government action turns out to have (as it may even be likely to have) the illegitimate *effect* of advancing religion.

holidays, including Thanksgiving"); *Marsh v. Chambers*, 463 U.S. 783, 792 (1983) (holding that prayer opening a legislative session is "simply a tolerable acknowledgment of beliefs widely held among the people of this country").

*McCreary*, 125 S. Ct. at 2735 (emphasis added).[7]  That is, if a monument has had a primarily secular history, the purpose inquiry ordinarily comes to an end; it suffices to see whether the monument "create[s] the . . . kind of religiously based divisiveness that the Establishment Clause seeks to avoid." *Van Orden*, 125 S. Ct. at 2871 (Breyer, J., concurring).

It is true, of course, that in *McCreary* the counties offered sectarian purposes for the first two versions of their Ten Commandments display, then created a third display with a secular purpose advanced only as a "litigating position." *McCreary*, 125 S. Ct. at 2740.  Surely, however, a different sequence of purposes (secular to religious) is not itself fatal, as long as secular purpose predominates over the course of the monument's existence.

Perhaps aware of the obstacle posed by the predominance test to its rush to drive religious mention from public view, the panel majority proceeds to commit a more grievous error:  It conveniently partitions the monument's lifetime into three distinct time periods and finds that it is unconstitutional because religious purpose predominates during the third period.  Doubtless, the *McCreary* Court analyzed the Kentucky monuments by considering three phases of their evolution, but it took all three phases into account when holding that religious purpose predominated.  *See id.*

---

[7] Furthermore, as already noted, *see supra* part I.A., *supra*, the opinion in *McCreary* is replete with language  indicating that the objective observer does not forget the purpose underlying previous iterations of the same display. *See, e.g.*, *McCreary*, 125 S. Ct. at 2737 n.14 (stating that "it will matter to objective observers whether posting the Commandments follows on the heels of displays motivated by sectarianism, or whether it lacks a history demonstrating that purpose"); *id.* at 2739 (stating that though the counties attempted to describe as "dead and buried" the sectarian purpose underlying a previous version of the display, "the reasonable observer could not forget it").

This is only sensible, because religious purpose will *always* predominate if one restricts the search for purpose to the most suspect period of the monument's history.

Likewise, if the *McCreary* Court had focused only on the third version of the Kentucky displays, it might have decided that case differently, because the state had recently offered legitimate secular purposes for its actions, such as educating the public about foundational documents that have influenced American law. *See id.* at 2739 & n.18. Though there may come a point, in the lifetime of a public display, at which the original purpose is so obscured that more recent statements of purpose take precedence, the predominance test exercises an inertial effect, presuming the centrality of the original purpose, unless there is compelling contrary evidence.

## C.

That evidence is lacking here. The panel majority ably explains why the Mosher memorial passed constitutional muster between 1956 and 1988: It is "clear and indisputable" that the Star of Hope Mission erected the monument as a tribute to Mosher's life and beneficence, and it stood for thirty-two years without legal challenge. *See Van Orden*, 125 S. Ct. at 2870-71 (Breyer, J., concurring). During the memorial's "second" stage, between 1988 and 1995, there was no religious aspect to the monument at all, because the Bible was voluntarily removed (or never replaced) by the Star of Hope after a challenge by a local atheist group.[8] It is only during the "distinct third phase," when Judge Devine restored and rededicated the monument, that the majority somehow ferrets out a "primarily religious purpose."

---

[8] *Cf. Van Orden*, 351 F.3d at 181 (noting that the Ten Commandments were temporarily removed in 1993 during a Capitol construction project).

If the majority is correct that Judge Devine and his cohorts attempted to "commandeer[] the monument for religious purposes" long after it was installed as a private memorial, this is precisely the result that *McCreary* prohibits. Use of the monument as an instrument of a state judge's political campaign should no more affect the reasonable observer's evaluation of its predominant purpose than should the litigating position adopted by the Kentucky counties to defend the third version of their courthouse displays. *See McCreary*, 125 S. Ct. at 2740. Rather, the reasonable observer, placing the rededication ceremony in the context of the long history of the Mosher memorial, surely would conclude that the predominant purpose of the Mosher memorial in 1995 remained the same as it was in 1956: to honor the life of a Houston businessman and Christian philanthropist.

## II.

Even assuming the validity of the panel majority's partitioning strategy for discerning government purpose, it gravely errs in the application of its premises to the post-1995 history of the monument. Though the majority describes as "factually baseless" the claim that Judge Devine restored the monument primarily to honor Mosher, that claim is amply supported by the record.

Devine testified that he learned about Mosher in the early nineties when he first saw the memorial before becoming a judge. He has since spoken with surviving members of the Mosher family and personally knows Carloss Morris, one of the founding members of the Star of Hope Mission. His court reporter, Karen Friend, invited the Mosher family to the rededication. What first attracted Judge Devine to the monument was its "state of disrepair," and he vowed "to restore that monument to its old glory."

32

If county officials can constitutionally allow a private group to erect a permanent memorial on public property, then surely a state official who works in county buildings may later take notice of the memorial's decrepit condition and seek to repair it, even if the person honored is long dead. We have never before rejected an admittedly secular purpose as a sham merely because the state actor, while still a candidate for office, ran on a general platform of putting Christianity back into government.[9] Rather, we have consistently recognized that "a purpose is no less secular simply because it is infused with a religious element."[10]

The panel majority also fails to explain how the presence of Christian ministers at the re-dedication ceremony, and the lack of involvement of a museum curator, distinguish the 1995 memorial from its 1956 predecessor. The record reflects that ministers attended the original ceremony and that the gatherers said prayers, neither of which fact suffices to negate a finding of predominant

---

[9] When asked to explain his platform at trial, Judge Devine replied, "I try to live my life according to Christian values. And if that comes out in my service to the community, then I'm pleased about that." The desire to execute the duties of one's office according to personal Christian values hardly amounts to an intent to unify church and state. It is, instead, a constitutionally-protected use of another part of the First Amendment, the often-overlooked Free Exercise Clause.

[10] *Freiler v. Tangipahoa Parish Bd. of Educ.*, 185 F.3d 337, 345-46 (5th Cir. 1999) (finding that mandatory disclaimer before teaching theory of evolution furthered the secular purposes of acknowledging alternative theories of the origin of life and reducing friction between parents and children on the subject); *see also Doe by Doe v. Beaumont Indep. Sch. Dist.*, 240 F.3d 462, 468 (5th Cir. 2001) (en banc) (deciding that a school program permitting clerical volunteers to counsel students advanced secular purpose of "provid[ing] dialogue between the clergy and students regarding civic values and morality").

secular purpose, because prayer is an entirely appropriate component of a ceremony held in memory of the deceased.[11]

Nor did a museum curator participate in the monument's installation, a fact that is unsurprising given that no decision with respect to its installation or refurbishment required the judgment of a professional curator.[12] Although the analogy of a "museum setting" can be helpful in resolving cases of this nature, "[w]e need not accept the State's museum analogy in full measure" to find that the context of a display does not amount to an endorsement of religion.[13] Because the primary secular purpose is honoring a member of the community, rather than presenting a thematic collection of historic or artistic artifacts, the absence of a curator is not especially probative. At any rate, neither of these facts supports the panel majority's conclusion that the Mosher memorial somehow "morph[ed] into a religious symbol" between 1956 and 1995.

Additionally, in conducting its truncated purpose analysis the majority wholly ignores the fact that the monument entered a distinct *fourth* stage of its existence in 1997, when control over its operation and maintenance was returned to the Star of Hope Mission, whose members are intimately acquainted with its original purpose and with Mosher's life. The fact that the Mission controlled the monument for six additional years between the end of Judge Devine's supervision and the filing of this suit highlights the brevity of the time period that has given offense to the panel majoritySSa scant two out of forty-seven years. The majority's hypothetical observer, so attentive to the sea-change

---

[11] *See infra* part III (noting that the dedication of the Washington Monument included a prayer in President Washington's honor).

[12] *Cf. Van Orden v. Perry*, 351 F.3d 173, 180-81 (5th Cir. 2003), *aff'd*, 125 S. Ct. 2854 (2005).

[13] *Id.* at 181.

34

in the monument's purpose supposedly wrought by the 1995 rededication, certainly would not have missed the fact that the original donors resumed possession two years later, thus removing any conjured constitutional infirmity.

III.

Finally, we must consider whether the appearance, setting, and alteration of this particular display would cause religious purpose to predominate or to have the impermissible effect of advancing religion. The Star of Hope Mission, a private charitable organization dedicated to meeting the needs of Houston's homeless population, conceived the monument as a memorial to Mosher, a considerable donor and supporter.[14] Critical to this monument's probable effect on the public—and the likely reason why it survived so long unchallenged—is its status *as a memorial*. Reflection on the sacred often accompanies the solemn remembrance of those who have departed this life.

One need look no further than the National Mall to find examples of famous memorials featuring inspiring religious invocations. The Jefferson Memorial contains several inscriptions with references to God, such as the statement that "God who gave us life gave us liberty. Can the liberties of a nation be secure when we have removed a conviction that these liberties are the gift of God?" The Lincoln Memorial contains inscriptions of the texts of President Lincoln's Second Inaugural Address and the Emancipation Proclamation, both of which reference God. At the dedication of the Washington Monument, a minister led the assembled crowd in prayer, which included this passage: "And now, O Lord of all power and majesty, we humbly beseech Thee to let the wing of Thy pro-

---

[14] *See Van Orden*, 125 S. Ct. at 2870 (Breyer, J., concurring) (noting that the donor of the Texas Capitol monument, the Fraternal Order of Eagles, is a private civic organization).

tection be ever outspread over the land of Washington!"[15]  A Bible is in the cornerstone of the obelisk, at least two interior memorial stones feature Bible passages (including one with an open Bible in bas-relief), and the apex of the east face bears the inscription *Laus Deo*, or "Praise be to God." These monuments, which are indisputably constitutional, instruct that official use of religious symbolism is constitutionally appropriate in memoriam.

The Mosher memorial is merely one of several honorific markers located on or near the grounds of the courthouse, including two wall plaques commemorating previous county commissioners and a memorial to Walter Quebedeaux, a public servant and environmental activist.  Although the Mosher memorial is the only one with religious content, the text is unthreatening to a nonadherent, because it is invisible to any observer who does not consciously decide to stand in front of the structure and look into the display.

Furthermore, unlike the counties in *McCreary* (and the Eagles in *Van Orden*, for that matter), the Star of Hope Mission never intended to emphasize any particular religious text in displaying the Bible:  An important fact in this regard, to which the majority ascribes no significance, is that the Mission's members periodically turn the pages to preserve the physical integrity of the book.  Instead of promoting a particular religious passage, the Mission intended the dedication to Mosher on the base of the monument to predominate, as shown by the fact that that dedication is both permanent and visible at a distance.[16]  The objective observer can only conclude that the discreetness of the Bible

---

[15] S. Doc. No. 57-224, at 131, 134 (1903).

[16] *Cf. McCreary*, 125 S. Ct. at 2728 (observing that the Ten Commandments display is "readily visible to . . . county citizens who use the courthouse to conduct their civic business") (internal quotations omitted); *Stone v. Graham*, 449 U.S. 39, 42 (1980) (opining that the only purpose of posting of Ten Commandments on classroom walls was "to induce the schoolchildren to read, meditate

both accommodates the Star of Hope's desire to include a symbol of Mosher's Christian faith in his memorial and respects the prerogative of the "[p]assersby who disagree with the message conveyed by these displays . . . to ignore them, or even to turn their backs, just as they are free to do when they disagree with any other form of government speech." *County of Allegheny v. ACLU*, 492 U.S. 573, 644 (1989) (Kennedy, J., concurring).

It remains to discuss the risible suggestion that we should attach significance to the apparently grave constitutional transgression that the current incarnation of the monument, unlike the original, contains a red neon light within the Bible display case. Karen Friend, who was closely involved with the restoration effort, testified that the light was originally installed to prevent the accumulation of moisture, an assertion supported by the fact that additional lights (not visible to the public) were later included in the base of the monument to dry the book from underneath, when moisture continued to be a problem.

Even if the light were installed primarily to illuminate the Bible, this is no cause for concern, for many public areas and displays are lit so that they may remain visible at night. Apparently wedded to the inaccurate notion that this light is particularly bright so as to attract attention (despite that a casual examination of the memorial reveals otherwise), the panel majority also somehow forgets that at oral argument, counsel for the plaintiff importantly conceded that a hypothetical *identical Biblical* monument, dedicated to the Reverend Martin Luther King, Jr., and obviously emphasizing the religious aspects of his life and service, would pass constitutional muster if it lacked a sectarian history.

upon, perhaps to venerate and obey, the Commandments").

37

The identity of the honoree, however, is a distinction without a difference. If a county could choose to honor a prominent spiritual and civil rights leader with a monument highlighting the Bible as a sign of his faith, there is no reason why they could not similarly honor a layman whose faith inspired a lifetime of philanthropy.

IV.

The panel majority does not, because it cannot, "decide that the Count[y's] past actions forever taint any effort on [its] part to deal with the subject matter." *McCreary*, 125 S. Ct. at 2741. On the basis of the majority opinion, as a matter of logic, the Star of Hope Mission would be within its rights to rededicate the monument at some future date (five years later, or ten?) and restore its predominantly secular character, free from the influence of Judge Devine. I have no illusions, however, that the "objective observer," as formulated by this court, would be as quick to forget the religious exhortations of Judge Devine as it today ignores the charitable contributions of William Mosher to the Houston community that memorialized him.

In a single misguided sentence, the majority reveals that what it seeks is not the predominant purpose of a display but the systematic exclusion of religion from the public sphere: "An original religious purpose may not be concealed by later acts, nor may a newfound religious purpose be shielded by reference to an original purpose." Bound by this premise, future panels of this court need not engage in the delicate task of deciding whether the record before us reveals, on balance, a governmental purpose to advance or inhibit religion. Rather, we may discharge our judicial duties merely by citing the above language, enjoining a private memorial whenever or wherever religious sentiment appears in the course of its existence over decades or even centuries.

This approach, however, inaccurately reflects the balance struck by the Court in *McCreary* and *Van Orden* between government neutrality and respect for the religious traditions of the United States and the American People.  Accordingly, I respectfully dissent.