# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

KATHLEEN M. WINN, an Arizona
taxpayer; DIANE WOLFTHAL, an
Arizona taxpayer; MAURICE
WOLFTHAL, an Arizona taxpayer
LYNN HOFFMAN, an Arizona
taxpayer,
            *Plaintiffs-Appellants,*

            v.

ARIZONA CHRISTIAN SCHOOL TUITION
ORGANIZATION; ARIZONA SCHOOL
CHOICE TRUST; LUIS MOSCOSO;
GALE GARRIOTT, in his official
capacity as Director of the
Arizona Department of Revenue;
GLENN DENNARD,
            *Defendants-Appellees.*

No. 05-15754

D.C. No.
CV-00-00287-EHC
District of Arizona,
Phoenix

ORDER

Filed October 21, 2009

Before: Dorothy W. Nelson, Stephen Reinhardt and
Raymond C. Fisher, Circuit Judges.

Order;
Concurrence by Judge Pregerson;
Concurrence by Judge D.W. Nelson;
Dissent by Judge O'Scannlain

## ORDER

Judges Reinhardt and Fisher voted to reject the petitions for rehearing en banc and Judge Nelson so recommended.

The full court was advised of the petitions for rehearing en banc. A judge requested a vote on whether to rehear the matter en banc, and the matter failed to receive a majority of the votes of the nonrecused active judges in favor of en banc consideration. Fed. R. App. P. 35.

The three petitions for rehearing en banc, filed May 14, 2009, are **denied.**

---

PREGERSON, Circuit Judge, concurring:

For the reasons stated by the panel in its concurrence, I also concur in the denial of rehearing en banc.

---

D.W. NELSON, REINHARDT and FISHER, Circuit Judges, concurring in the denial of rehearing en banc:

A majority of the active judges of our court declined to vote for rehearing of this case en banc. We concur in the court's decision not to go en banc.

The State of Arizona finances private "school tuition organizations" (STOs) by giving dollar-for-dollar tax credits to individuals who contribute to them. On its face, the statute creating this subsidy requires STOs to provide scholarships for students "to attend *any* qualified school of their parents' choice." Ariz. Rev. Stat. Ann. § 43-1089(G)(3) (2005) (emphasis added).[1] As the Arizona Department of Revenue

---

[1] All references to "Section 1089" refer to the program as set forth in Arizona Revised Statutes Annotated § 43-1089 (2005), the version of the

applies the statute, however, the state reimburses contributions to STOs that restrict their scholarships to use at religious schools. Consequently, 85 percent or more of the state-financed scholarship money is available only to students whose parents are willing to send them to sectarian institutions.[2]

If these facts are proved true, the Arizona Department of Revenue's execution of the scholarship program (Section 1089) violates the Establishment Clause. In *Zelman v. Simmons-Harris*, 536 U.S. 639 (2002), the Court upheld a school voucher program that "provide[d] assistance directly" to parents without regard for religion, and public funds reached religious institutions only as the result of parents' choices about their children's education. *Id.* at 652. Parents received aid whether or not they were willing to enroll their children in sectarian schools, so the program did not exert pressure on parents to choose religious schools. Under the Arizona program, by contrast, taxpayers, rather than parents, direct funds to religious organizations. Access to assistance is restricted on the basis of religion, creating financial incentives that may skew parents' choices toward religious schools. *See*

statute in place when plaintiffs' complaint was filed. Any differences between this and the current version of Section 1089 are not significant for purposes of the analysis.

[2]The dissent sees no constitutional distinction between a tax deduction and a tax credit. *See* Dissent 14721 n.3. We disagree. A tax-credit eligible contribution to an STO costs the taxpayer nothing. *See Winn v. Killian*, 307 F.3d 1011, 1015 n.5 (9th Cir. 2002), *aff'd sub. nom Hibbs v. Winn*, 542 U.S. 88 (2004) ("From a purely financial perspective, . . . a taxpayer is unaffected by his decision as to whether or not to make an STO contribution. The funds that he may contribute will be unavailable to him in any event: they will be used either to make the contribution or to pay the taxes he owes."). Tax deductible contributions, by contrast, impose a cost on the taxpayer. *See id.* ("[W]hen a taxpayer is entitled to a tax deduction, the taxpayer must in most if not all instances still pay a majority of the tax involved[.]"). Whereas a tax deduction would lower the cost of contributions to STOs, a dollar-for-dollar tax credit reduces that cost to zero, in effect allowing individual taxpayers to directly allocate public funds.

*id.* at 650. The differences between the Ohio and Arizona programs are constitutionally meaningful.

The dissent from rehearing en banc demonstrates that others may prefer a more expansive reading of *Zelman*. Careful review of the two cases, however, shows why the dissent's argument that "*Winn* cannot be squared with the Supreme Court's mandate in *Zelman*" is not persuasive. Dissent 14719-20.

## I.  Background

On its face, Section 1089 appears to provide for parental choice. The statute says that for an organization to qualify as an STO eligible to receive state-reimbursed contributions the organization must provide scholarships "to children to allow them to attend *any* qualified school *of their parents' choice*." Ariz. Rev. Stat. Ann § 43-1089(G)(3) (emphasis added).[3] If this were how Arizona applied the statute, the Arizona program would be similar to the majority of the tax credit programs currently in operation. Like Section 1089, four of these programs contain provisions directing scholarship organizations to provide scholarships for students to attend *any* qualified school of their parents' choice.[4] These "parental choice" clauses may explain the apparent absence of any Establishment Clause challenges to those programs.

---

[3]A "qualified school" is defined by statute as "a nongovernmental primary school or secondary school or a preschool for handicapped students that is located in this state, that does not discriminate on the basis of race, color, handicap, familial status or national origin and that satisfies the requirements prescribed by law for private schools in this state." *Id.* § 43-1089(G)(2).

[4]*See* Fla. Stat. § 220.187(6)(h); Ga. Code Ann. § 20-2A-1(3)(A); Ind. Code § 20-51-3-1(b); Iowa Code § 422.11S(5)(c)(1); R.I. Gen. Laws § 44-62-2(a). One of the currently operating programs contains no such parental choice provision. *See* 24 Pa. Stat. Ann. § 20-2005-B.

This is not, however, how the Arizona Department of Revenue applies the statute. According to plaintiffs' complaint, Arizona gives tax credits reimbursing individuals who contribute to STOs that expressly restrict their scholarships to use at religious schools. The largest STO, the Catholic Tuition Organization of the Diocese of Phoenix, restricts its scholarships to use at Catholic schools in the Phoenix Diocese; the second largest, the Arizona Christian School Tuition Organization provides scholarships only to students attending evangelical Christian schools; and the third largest, Brophy Community Foundation, restricts its scholarships to use at two specific Catholic schools. *See Winn*, 562 F.3d at 1006. As a result of how the Arizona Department of Revenue applies Section 1089, plaintiffs allege, these three religious STOs controlled 85 percent of the total STO donations in 1998, the year before the complaint was filed. *See id.* at 1006. Plaintiffs argue that it is this application of Section 1089 that violates the Establishment Clause.

## II.   Effect

We turn first to the issue of "whether Section 1089 'has the forbidden "effect" of advancing or inhibiting religion.' " *Winn*, 562 F.3d at 1012 (quoting *Zelman*, 536 U.S. at 649).

### A.   Parental Choice

The *Winn* panel held that the Arizona Department of Revenue's application of Section 1089 may not provide parents with "true private choice" within the meaning of *Zelman*. *See id.* at 1015-18. With respect to this conclusion, the dissent accuses the panel of rejecting the majority's holding in *Zelman* in favor of Judge Souter's dissent. Not so.

### 1.

The dissent fails to address the crucial difference between the Ohio voucher program upheld in *Zelman* and the Arizona

Department of Revenue's application of Section 1089: with respect to religion, the Ohio program gave parents *equal access* to tuition benefits. *See Zelman*, 536 U.S. at 645. Under the Ohio program, the state provided tuition aid on the basis of financial need, without regard to religion, and eligible parents were free to apply the aid toward any private school, religious or secular, or toward a public school outside the district willing to participate in the program (though none was). If a parent decided to send her child to a private school, the state wrote a check made payable to the parent, which the parent could then endorse over to her chosen school. *See id.* at 646. Crucially, a parent's choice to send her child to a religious school would *neither help nor harm* her chance of receiving tuition aid.

Whether such a program violates the Establishment Clause, the Court held, does not depend on whether the parent receiving tuition aid has a broader array of religious than secular schools to choose from. This is because "[t]he constitutionality of a *neutral* educational aid program simply does not turn on whether and why, in a particular area, at a particular time, most private schools are run by religious organizations, or most recipients choose to use the aid at a religious school." *Id.* at 658 (emphasis added). The majority in *Zelman* made clear, however, that a "neutral educational aid program" — or, as the Court also put it, a "program of true private choice" — is one that grants *access* to benefits without regard to religion. *Id.* at 658, 662.

The importance of providing equal access to benefits is emphasized throughout *Zelman*. A common thread running through indirect aid programs the Supreme Court has upheld against Establishment Clause challenges, the *Zelman* Court observed, is that they have been "*neutral* with respect to religion[ ] and provide[d] assistance *directly* to a broad class of citizens." *Id.* at 652 (emphases added); *see also Mueller*, 463 U.S. at 397; *Witters v. Wash. Dep't of Servs. for the Blind*, 474 U.S. 481, 487 (1986); *Zobrest v. Catalina Foothills Sch.*

*Dist.*, 509 U.S. 1 (1993).[5] Likewise, under the Ohio voucher program, the Court stressed, "[p]rogram *benefits* are available to participating families *on neutral terms*, with no reference to religion." *Zelman*, 536 U.S. at 653 (emphases added).

By contrast, as plaintiffs allege the Arizona Department of Revenue applies the statute, access to Section 1089-funded scholarships is not "available . . . on neutral terms, with no reference to religion." Parents who are unwilling to send their child to a religious school may be denied access to program benefits because, as plaintiffs allege, there are not a sufficient number of scholarships available for use at secular schools. Accordingly, these parents are shut out of the program altogether, and at the very least their chances of receiving benefits are harmed by their choice to send their child to a secular school.

This lack of access on a religiously neutral basis explains why Section 1089 as operated by the Arizona Department of Revenue would violate the Establishment Clause. This conclusion is entirely consistent with — and required by — the Court's analysis in *Zelman*. It is true that the majority in *Zelman* rejected Justice Souter's view that the number of religious and secular schools participating in the Ohio voucher program was relevant to its constitutionality. But before the Court addressed Justice Souter's concerns, it first identified several features of the Ohio program that made it one of "true private choice . . . , and thus constitutional." *Id.* Among these features, the tuition aid distributed under the Ohio program

---

[5]The program upheld in *Mueller*, *Zelman* explained, provided aid to " '*all* parents' " to pay for certain educational expenses at secular or religious schools. *Zelman*, 536 U.S. at 650 (quoting *Mueller*, 463 U.S. at 397). Under the program in *Witters*, *Zelman* continued, "*recipients* generally were empowered to direct the aid to schools or institutions *of their own choosing*." *Id.* at 651 (emphases added). Likewise, the program upheld in *Zobrest* " 'distribute[d] benefits *neutrally to any child* qualifying as disabled,' " without regard to religion. *Id.* (emphasis added) (quoting *Zobrest*, 509 U.S. at 10).

created "no 'financial incentives' that 'skew[ed]' the program toward religious schools." *Id.* (alteration omitted) (quoting *Witters*, 474 U.S. at 487-88). The Court recognized that "[s]uch incentives 'are not present where the aid is *allocated* on the basis of neutral, secular criteria that neither favor nor disfavor religion, and is *made available to both religious and secular beneficiaries on a nondiscriminatory basis*.' " *Id.* at 653-54 (emphasis added, alteration and ellipses omitted) (quoting *Agostini v. Felton*, 521 U.S. 203, 231 (1997)).

The Arizona Department of Revenue permits scholarships funded under Section 1089 *not* to be "made available to both religious and secular beneficiaries on a nondiscriminatory basis." Therefore, *Zelman* requires a closer look at whether the program, as applied, creates "financial incentives that skew the program toward religious schools." *Id.* at 653 (alterations and internal quotation marks omitted). This is why it is relevant that, by allowing tax credits for contributions to discriminatory STOs, the Arizona Department of Revenue has created an overwhelming disparity in the number of scholarships exclusively available for use at religious schools compared to the number available for use at secular schools. *See Winn*, 562 F.3d at 1016-18.

Consistent with Section 1089's parental choice provision, *see* Ariz. Rev. Stat. Ann. § 43-1089 (2005), the Arizona Department of Revenue *could* apply the program to require that STOs make state-funded scholarships "available to both religious and secular beneficiaries on a nondiscriminatory basis." *Zelman*, 536 U.S. at 653-54 (internal quotation marks omitted). If Section 1089 were applied in this neutral manner, data concerning the number of scholarships applied toward religious schools versus secular schools would indeed be irrelevant to the Establishment Clause inquiry as long as the State of Arizona otherwise provided students "a range of [secular] educational choices." *Id.* at 655.

As Section 1089 is currently applied, however, the program allows state-funded scholarships to be restricted to use at religious schools. It is therefore necessary to consider whether, in reality, the program creates incentives for parents to send their children to religious schools in order to gain access to benefits. This conclusion is required by — and, at the very least, consistent with — *Zelman*.[6]

## 2.

The dissent contends that the Arizona program is valid because the State of Arizona has *other* programs in place that provide secular educational options for those unable to obtain a program scholarship. *See Zelman*, 536 U.S. at 655-56 ("The Establishment Clause question is whether Ohio is coercing parents into sending their children to religious schools, and that question must be answered by evaluating *all* options Ohio provides Cleveland schoolchildren, only one of which is to *obtain* a program scholarship and then choose a religious school." (emphases added)). The dissent fails to recognize *Zelman's* holding that a program of "true private choice" is one in which "[p]rogram benefits are available to participating families on neutral terms, with no reference to religion." *Id.* at 653. A short hypothetical will show why the dissent's reading of *Zelman* is untenable. Consider a program, instituted by a state that provides an array of secular educational options, that offers tax deductions exclusively to parents sending their children to private schools. Each eligible parent receives a tax

---

[6]The dissent's hypothetical, about a world in which Section 1089 operates to restrict scholarships to use at secular schools, is premised on the misunderstanding that, under the Free Exercise Clause, governments have an affirmative obligation to fund religious educational options if they decide to make secular options available. *See* Dissent 14725-26. *But see Locke v. Davey*, 540 U.S. 712 (2004) (rejecting Free Exercise challenge to statute providing postsecondary education scholarships but prohibiting use of the scholarships for a degree in devotional theology from a religious institution). Constitutional limitations on support for religion do not precisely mirror limitations on failures to support religion.

deduction unrelated to the amount spent on tuition, thus ensuring a windfall to parents who send their children to religious schools, which typically charge lower rates than secular private schools. Assume this hypothetical program has a valid secular purpose. For most potential recipients, however, benefits under the program are, as a practical matter, available only if the recipient chooses to send her child to a relatively low-cost religious school. Thus, the unmistakable effect of the program is to create special incentives to send one's child to a sectarian school.

Under the dissent's reading of *Zelman*, this hypothetical program would easily withstand an Establishment Clause challenge. Anyone can participate in the program. Anyone who participates receives identical tax benefits. Anyone can apply the tax benefits toward a private school of his or her choice. *See* Dissent 14722. Moreover, for those who choose not to participate in the program, the state provides an array of public schooling options. *See id.* at 14732-33.

This program is not a hypothetical; it is the New York tax deduction scheme invalidated in *Committee for Public Education & Religious Liberty v. Nyquist*, 413 U.S. 756 (1973) — a case that *Zelman* distinguished but declined to overturn.[7] *See Nyquist*, 413 U.S. at 788 ("In its attempt to enhance the opportunities of the poor to choose between public and non-

_____

[7]The New York program also had provisions offering private school tuition reimbursements, paid directly to the school, for parents who fell below a certain income level and grants to private schools for the maintenance and repair of their facilities. The Court treated each provision of the program as severable and held that each provision separately violated the Establishment Clause. *See Nyquist*, 413 U.S. at 741-45. Nothing in *Zelman* suggests the Court would have upheld the tax deduction provision of the New York program if it had been considered in isolation. *See Zelman*, 536 U.S. at 661 (observing that New York program "gave a package of benefits exclusively to private schools and the parents of private school enrollees" and "provided tax benefits 'unrelated to the amount of money actually expended by any parent on tuition,' ensuring a windfall to parents of children in religious schools" (quoting *Nyquist*, 413 U.S. at 790).

public education, the State has taken a step which can only be regarded as one 'advancing' religion."); *Zelman*, 536 U.S. at 661 (observing that the " 'function' " of the New York program "was '*unmistakably* to provide desired financial support for nonpublic, sectarian institutions' " (quoting *Nyquist*, 413 U.S. at 783 (emphasis added))). *Zelman* explained that *Nyquist* had "expressly reserved judgment with respect to 'a case involving some form of public assistance (*e.g.*, scholarships) made available generally without regard to the sectarian-nonsectarian, or public-nonpublic nature of the institution benefitted.' " *Id.* (quoting *Nyquist*, 413 U.S. at 782-83). The Ohio voucher program fit this description. The Arizona Department of Revenue's application of Section 1089 does not.

In *Zelman*, the Court clarified that "*Nyquist* does not govern neutral educational assistance programs that . . . offer aid directly to a broad class of individual recipients defined without regard to religion." *Id.* at 662. According to the dissent, Section 1089 is such a "neutral educational assistance program." By the dissent's logic, however, the New York program invalidated in *Nyquist* would also be such a program. Even more troublesome, a program that provided tax deductions exclusively to parents sending their children to *religious* schools would also constitute a "neutral educational assistance program" as long as the state had other programs in place that provided secular educational options. It is this result, not the outcome in *Winn*, "that simply cannot be reconciled with *Zelman*." Dissent 14724. The Supreme Court elected not to overturn *Nyquist*, and we may not do so on its behalf.

## B. Taxpayer Choice

Next, the dissent challenges the panel's conclusion that the choices provided to *taxpayers* under Section 1089 — choices that, plaintiffs allege, restrict *parents*' access to secular educational scholarships — fail to render the program constitu-

tional. *See Winn*, 562 F.3d at 1018-23. Specifically, the dissent contends the panel misapplied *Larkin v. Grendel's Den, Inc.*, 459 U.S. 116 (1982). A careful reading of *Winn* shows that the dissent exaggerates the panel's reliance on *Larkin*.

*Larkin* does not control this case. *See Winn*, 562 F.3d at 1020 (emphasizing that "the delegation of scholarship funding to individual taxpayers, such as in Section 1089, does less to promote religion than the delegation of zoning authority to churches," such as provided under the statute at issue in *Larkin*). Rather, the panel observed that *Larkin*'s holding

> illustrates that when a statute delegates "a power ordinarily vested in agencies of government" to a private party, *see* [*Larkin*, 459 U.S.] at 522, without reasonable assurance that the party's choices will advance the secular purposes of the statute, any ensuing "perceived endorsement of a religious message" may be "reasonably attribut[ed]" to the government.

*Winn*, 562 F.3d at 1020-21 (second quotation from *Zelman*, 536 U.S. at 652).

Contrary to the dissent's suggestion, *Larkin*'s holding is not limited to cases where the state vests governmental powers in a "pervasively sectarian organization." Dissent 14735. In *Board of Education of Kiryas Joel Village School District v. Grumet*, 512 U.S. 687 (1994), for example, the Court applied *Larkin* when considering an Establishment Clause challenge to a statute creating a school district coextensive with a religious community. This statute vested power in individual taxpayers, not in a religious organization, but the Court nonetheless invalidated it. *See id.* at 698 ("The Establishment Clause problem [at issue] is more subtle [than that in *Larkin*], but it resembles the issue raised in *Larkin* to the extent that the earlier case teaches that a State may not delegate its civic

authority to a group chosen according to a religious criterion."). Again, *Winn* does not suggest that the choices delegated to taxpayers under the Arizona Department of Revenue's construction of Section 1089 are the constitutional equivalent of the legislative action at issue in *Kiryas Joel*. That case makes clear, however, that the delegation concerns identified in *Larkin* are relevant to whether a reasonable, informed observer would conclude that the choices delegated under Section 1089 have the effect of promoting, or hindering, the program's secular purpose.[8]

The dissent further argues that in terms of constraining parents' access to secular educational options, taxpayers' choices under Section 1089 are no more constitutionally problematic than the choice of public schools not to participate in the Ohio voucher program in *Zelman*. Dissent 14736. This misses the point. Under the Ohio program, it was not the public schools' choices that ensured "the Establishment Clause was not implicated" — it was the *parents'* choices. *Zelman*, 536 U.S. at 652. Each parent had an equal choice under the Ohio program as to whether to apply a tuition voucher toward a private school, and the choice of one parent did not directly alter the array of options available to another parent. Accordingly, under the Ohio program, a parent's choice as to how best to educate her child had no coercive effect on another parent's choice whether to send her child to a secular or religious school. The Ohio program thus provided each eligible parent with a "genuine and *independent* private choice" whether to direct assistance to a religious school. *Id.* (emphasis added). The choices given to parents under the program therefore ensured "the circuit between government and religion was broken." *Id.* Although a public school's decision not to accept

---

[8]The dissent asserts that the "allocation of scholarship funds" is not a traditional governmental function. Dissent 14735 n.20. This framing of the question is unhelpfully narrow. Educational policy is certainly a traditional government function, and the state's decision to reimburse contributions to private scholarship funds is indisputably an educational policy decision.

a voucher could indeed frustrate the secular purpose of the Ohio program, the Supreme Court did not *rely* on those choices to conclude the program was constitutional.

By contrast, the appellees in *Winn rely* on taxpayers' choices in arguing that the current construction of Section 1089 is valid under the Establishment Clause. The effect of these taxpayer choices, however, may be to *harm* the ability of aspiring scholarship recipients to obtain a scholarship available for use at a secular school. Accordingly, Section 1089 "delegat[es] to taxpayers a choice that, from the perspective of the program's aid recipients, 'deliberately skew[s] incentives toward religious schools.' " *Winn*, 562 F.3d at 1013 (quoting *Zelman*, 536 U.S. at 650)). Such choices are not, in themselves, sufficient to render an educational aid program valid under the Establishment Clause.

In summary, it was crucial to *Zelman*'s holding that the Ohio program afforded aid *recipients* a "genuine and independent private choice" whether to direct the assistance they received toward a religious school. *Zelman*, 536 U.S. at 652. Although the Arizona Department of Revenue's application of Section 1089 does not afford such choice, *Winn* carefully determined that the choice provided to *taxpayers* is insufficient to ensure "the circuit between government and religion was broken." *Id.* For reasons carefully laid out in the decision, our court was correct to decline en banc review.

### III.   Secular Purpose

The dissent also faults *Winn* for concluding that Section 1089 may lack a valid secular purpose. *See* 562 F.3d at 1011-12. This criticism is premature. The question before the panel was "not whether Section 1089 in fact has a genuine, secular purpose, but whether plaintiffs could prove, on the facts alleged in the complaint, that it does not." *Id.* at 1012.

As the dissent states, a "legislature's stated reasons" for enacting a statute "will generally get deference," and must be

accepted as true except in "unusual cases where the claim was an apparent sham, or the secular purpose secondary." *McCreary County v. ACLU of Ky.*, 545 U.S. 844, 865 (2005). The inquiry into whether a statute's ostensible purpose is a sham or secondary to a religious objective, however, must be "undertaken from the perspective of 'an objective observer, one who takes account of the traditional external signs that show up in the text, legislative history, and implementation of the statute, or comparable official act.' " *Winn*, 562 F.3d at 1012 (quoting *McCreary*, 545 U.S. at 862. The dissent's position would foreclose such an inquiry.

The dissent surmises that in enacting Section 1089, "[t]he legislature could hardly have had the 'purpose' of endorsing religion when it set up a plan that, *for all it knew*, could have resulted in absolutely no funding for religious entities." Dissent 14739 (emphasis added). The dissent makes this claim without citing any evidence concerning what the legislature *actually* knew about how Section 1089 would likely operate. This is just as well, because no such evidence yet appears in the record. But the dissent suggests it should not *matter* to us whether the legislature knew that Section 1089 would result in disproportionate funding being made available only for use at religious institutions. The Supreme Court has cautioned us, however, against evaluating a program's purpose from the perspective of an "absentminded objective observer, not one presumed to be familiar with the history of the government's actions and competent to learn what history has to show." *McCreary*, 545 U.S. at 866. In short, the dissent appears to call for either a heightened pleading standard for Establishment Clause claims — under which the plaintiff must allege specific facts establishing that the legislature acted for an invalid purpose — or an approach to evaluating a program's purpose that "would cut context out of the enquiry, to the point of ignoring history." *Id.* at 864.

Regarding evidence of Section 1089's implementation, the dissent contends that because taxpayer contributions to STOs

are private conduct, they are irrelevant to whether Section 1089 has a valid secular purpose. Notably, in an as-applied context, at least two circuits have considered private conduct under a government program to be probative of the program's purpose,[9] and *Winn* does not foreclose the possibility that plaintiffs can point to private conduct probative of whether Section 1089 has a secular purpose. More probative, however, is the *government* conduct on the part of the State of Arizona in implementing Section 1089.

The Arizona Department of Revenue implements Section 1089 by allowing individuals to claim tax credits for contributions to private STOs. *See Winn*, 562 F.3d at 1009 ("The Supreme Court has recognized . . . that *state tax policies* such as tax deductions, tax exemptions and tax credits are *means of 'channeling . . . [state] assistance'* to private organizations . . . ." (emphasis added, ellipses in original) (quoting *Mueller*, 463 U.S. at 399)). According to plaintiffs' complaint, the Arizona Department of Revenue allows tax credits for contributions to STOs that provide scholarships only to religious schools. Individuals' contributions to STOs that discriminate on the basis of religion are not, of themselves, probative of Section 1089's purpose. The fact that the Arizona Department

---

[9] *See Staley v. Harris County, Tex.*, 461 F.3d 504, 513 (5th Cir. 2006); *Bonham v. D.C. Library Admin.*, 989 F.2d 1242, 1244-45 (D.C. Cir. 1993). In *Staley*, the Fifth Circuit considered the community response to a government-sponsored monument of a local citizen carrying a Bible in evaluating whether the monument had a valid secular purpose. *See* 461 F.3d at 513 ("[T]he fact that the monument, with the Bible, stood without complaint [from citizens] for thirty-two years, supports the notion that the original purpose was not objectively seen as predominantly religious."). In *Bonham*, Judge Mikva, reversing the district court's dismissal under Rule 12(b)(6) of a pro se plaintiff's claim that the closing of a public library on Easter Sunday violated the Establishment Clause, observed: "In determining the legislative purpose of a law or government practice, courts generally look to . . . testimony of *parties who participated in the enactment or implementation of the challenged law or practice*, historical context, and the sequence of events leading to the passage of the law or the initiation of the practice." 989 F.2d at 1244-45 (emphasis added).

of Revenue gives tax credits for these contributions, however, could be probative of legislative expectations as to how state assistance under Section 1089 would be directed in practice.

Accordingly, by declining to rehear this case en banc, we appropriately rejected the suggestion that we should turn a blind eye to the history and implementation of Section 1089 simply because the statute is facially neutral.

## IV.   Conclusion

This case required the panel to apply *Zelman* to an educational aid program that, according to the allegations of plaintiffs' complaint, lets taxpayers choose to make state-reimbursed contributions to private scholarship organizations, but allows the organizations to restrict access to state-funded scholarships on the basis of religion. *Winn* correctly held that such a program would not, under *Zelman*, provide parents with "genuine and independent private choice," and that the choice given to taxpayers under such a program could not be treated as the constitutional equivalent of the choice given to parents under the Ohio voucher program. Unlike the program in *Zelman*, the program alleged here neither makes scholarships available to parents on a religiously neutral basis nor gives them a true private choice as to where to utilize the scholarships. The panel correctly held that these allegations, if proven true, could establish an Establishment Clause violation. We therefore concur in the denial of rehearing en banc.

---

O'SCANNLAIN, Circuit Judge, dissenting from the denial of rehearing en banc, joined by KOZINSKI, Chief Judge, KLEINFELD, GOULD, TALLMAN, BYBEE, BEA, and N.R. SMITH, Circuit Judges:

This case involves an Establishment Clause challenge to an Arizona educational tax credit program that provides scholar-

ships to students wishing to attend private schools. This case is more notable, however, for what it does not involve: state action advancing religion. The government does not direct any aid to any religious school. Nor does the government encourage, promote, or otherwise incentivize private actors to direct aid to religious schools. Rather, "state aid reaches religious schools solely as a result of the numerous independent decisions of private individuals." *Zelman v. Simmons-Harris*, 536 U.S. 639, 655 (2002).

Unable to find any forbidden state action, the district court correctly dismissed the case on the pleadings. Sadly, our three-judge panel reversed. *See Winn v. Ariz. Christian Sch. Tuition Org.*, 562 F.3d 1002 (9th Cir. 2009). Because a program of scrupulous "governmental neutrality between religion and religion, and between religion and nonreligion," *Epperson v. Arkansas*, 393 U.S. 97, 104 (1968), cannot violate the Establishment Clause, I respectfully dissent from our full court's regrettable denial of rehearing en banc.

I dissent not only because *Winn* cannot be squared with the Supreme Court's mandate in *Zelman*, but also because the panel's holding casts a pall over comparable educational tax-credit schemes in states across the nation and could derail legislative efforts in four states within our circuit to create similar programs.[1] In short, the panel's conclusion invalidates an increasingly popular method for providing school choice, jeopardizing the educational opportunities of hundreds of thousands of children nationwide.[2]

---

[1]*See* Fla. Stat. § 220.187; Ga. Code Ann. § 48-7-29.16; Ind. Code § 6-3.1-30.5; Iowa Code § 422.11S; 24 Pa. Stat. Ann. 20-2005-B; R.I. Gen. Laws § 44-62-2; A.B. 279, 2009-10 Leg., Reg. Sess., § 1 (Ca. 2009); S.B. 342, 61st Leg., Reg. Sess., § 1(3)(b)-(c) (Mont. 2009); S.B. 289, 75th Leg., Reg. Sess., § 6(1) (Nev. 2009); H.B. 2754, 75th Leg., Reg. Sess. (Or. 2009).

[2]Such programs have operated without incident, perhaps because no one has thought to challenge them post-*Zelman*. *Cf., e.g.*, *Bush v. Holmes*, 919 So. 2d 392, 399 (Fla. 2006) (explaining that plaintiffs voluntarily dismissed a challenge to a Florida school choice program after *Zelman*).

# I

Arizona law ("Section 1089") allows individuals voluntarily to contribute money to private, nonprofit corporations known as "student tuition organizations" ("STOs"). Ariz. Rev. Stat. Ann. § 43-1089(A). Anyone can form an STO, and there are no constraints on a taxpayer's ability to donate to an STO of his choice. Should a taxpayer elect to direct funds to an STO, that contribution is refunded via tax credits of up to $500 for individual taxpayers and up to $1000 for married couples filing jointly.[3] *Id.*

STOs use these funds to provide scholarships and tuition grants to students attending schools within the state. *Id.* § 43-1089(G). While essentially any private school is statutorily eligible to receive scholarship monies,[4] STOs may choose which institutions they will support, so long as they provide funds to more than one school. *Id.*[5] Parents then decide which

---

[3]The distinction the panel tries to draw between a tax credit and a deduction, *see* 562 F.3d at 1014-15, can have no constitutional significance. Both result in a reduction of the money paid by the taxpayer to the government, with the amount of the reduction going to the designated STO. The only practical difference is that with a deduction the taxpayer must make a co-payment of his own, whereas with a credit there is no co-payment. Of course, this favors richer taxpayers over poorer ones, as the former are more able to afford a personal contribution. Moreover, in a progressive tax system, deductions most favor the taxpayers with the greatest income. Not only does the value of the deduction increase with the taxpayer's marginal rate, but so does the amount of government revenue that is diverted at the taxpayer's behest. It is difficult to see why such a regressive regime (deductions) is constitutionally superior to the egalitarian tax credit. *Cf. Lochner v. New York*, 198 U.S. 45, 75 (1905) (Holmes, J., dissenting) (The Constitution "does not enact Mr. Herbert Spencer's social statics.").

[4]Schools that "discriminate on the basis of race, color, handicap, familial status or national origin" are ineligible. *Id.* § 43-1089(G)(2).

[5]Like virtually every other tax credit system, *see supra* note 1, the Arizona statute requires STOs to provide scholarships "without limiting availability to only students of one school." Ariz. Rev. Stat. Ann. § 43-

private school they would like their child to attend, and apply for scholarships from appropriate STOs.

In sum, the state's involvement stops with authorizing the creation of STOs and making tax credits available. After that, the government takes its hands off the wheel. Anyone can create an STO. Anyone can contribute to any STO and receive identical tax benefits. Anyone can apply for any scholarship offered by any STO.

Shortly after Section 1089's enactment, the Arizona Supreme Court held that the statute, on its face, did not violate the Establishment Clause. *See Kotterman v. Killian*, 972 P.2d 606 (Ariz. 1999). Taxpayer plaintiffs then brought this federal action, which was dismissed by the district court under the Tax Injunction Act. *See Winn v. Killian*, 307 F.3d 1011, 1013 (9th Cir. 2002). After the suit was reinstated, *see id.* at 1020; *see also Hibbs v. Winn*, 542 U.S. 88 (2004) (affirming our opinion reversing its dismissal), the district court again dismissed the action, this time on federal constitutional grounds, *see Winn v. Hibbs*, 361 F. Supp. 2d 1117 (D. Ariz. 2005).

Plaintiffs appealed. They allege (and no one disputes) that in practice, some STOs make their scholarships available only to students willing to attend religiously affiliated schools. *Winn*, 562 F.3d at 1006. While the majority of STOs do not so limit their scholarships,[6] plaintiffs maintain that those that do receive the overwhelming majority of taxpayer contributions. *See id.* Consequently, they assert that the pool of avail-

---

1089(G)(3). And again, like most other schemes, *see supra* note 1, the statute says STOs should allow children "to attend any qualified school of their parents' choice." *Id.* While hardly the model of clarity, this language has been interpreted to mean STOs satisfy the statue by providing scholarships to at least two schools.

[6]Twenty-five of the fifty-five existing STOs limit scholarship awards to religious schools.

able scholarship money is diminished for parents wishing to send their children to secular schools. *See id.* Plaintiffs contend that this disparity means Section 1089, as applied, impermissibly favors religion over nonreligion. *See id.*

The three-judge panel agreed and reversed the district court's dismissal, holding that "if plaintiffs' allegations are accepted as true, Section 1089 violates the Establishment Clause." *See id.* at 1013. Concluding that the nature of the tax credit made taxpayer contributions tantamount to government funds, the panel found that Section 1089 potentially violated both the purpose and effects prongs of *Lemon v. Kurtzman*, 403 U.S. 603 (1971). *See id.* at 1011-23. The fact that taxpayers directed the majority of available funds to religious schools, the panel reasoned, deprived parents of a "genuinely independent and private choice[ ]" to send their children to secular private schools. *Id.* at 1013 (internal quotation marks and citation omitted). Accordingly, Section 1089 was not a "neutral program of private choice and a reasonable observer could . . . conclude that the aid reaching religious schools . . . carries with it the *imprimatur* of government endorsement." *Id.* at 1013-14 (internal quotation marks and citation omitted).[7]

## II

I have no bone to pick with the manner in which the panel frames the basic constitutional inquiry. We all understand that the Establishment Clause "prevents a State from enacting laws that have the 'purpose' or 'effect' of advancing or inhibiting religion." *Zelman*, 536 U.S. at 648-49. More often than

---

[7]Make no mistake about the procedural posture of this decision. True, the case will be remanded to the district court. But the panel holds that, "if plaintiffs' allegations are accepted as true, Section 1089 violates the Establishment Clause." *Winn*, 562 F.3d at 1013. So far as I can tell, no one disputes plaintiffs' factual allegations about how the program operates in practice. Thus, the panel leaves the district court with no choice but to declare the program unconstitutional as applied, rendering the remand little more than an empty formality.

not, the Court determines whether these commands have been violated by asking whether a "reasonable observer," who is "aware of the history and context underlying a challenged program," would conclude that the state has "endorsed" religion. *Id.* at 655 (internal quotation marks and citation omitted).

The panel's heavy emphasis on *Zelman* is also warranted. In that case, the Supreme Court upheld an Ohio school voucher program that provided tuition aid to Cleveland families on the basis of need. *Id.* at 644-45. The vouchers were distributed directly to parents, who could choose to use the scholarship money at any participating private, community, magnet, or public school. *Id.* at 645-46. The Court ruled that a "neutral program of private choice, where state aid reaches religious schools solely as a result of the numerous independent decisions of private individuals" does not violate the Establishment Clause. *Id.* at 655.

It is in the application of these standards, however, that the three-judge panel lost the forest for the trees. In doing so, it reached a result that simply cannot be reconciled with *Zelman*.[8]

### III

The panel is correct that a law may not have the "forbidden 'effect' of advancing . . . religion." *Id.* at 649. What the panel seems to neglect, however, is that "[f]or a law to have forbidden 'effects' under *Lemon*, it must be fair to say that the *government itself* has advanced religion through its own activities and influence." *Corp. of the Presiding Bishop of the Church of Jesus Christ of Latter-Day Saints v. Amos*, 483 U.S. 327, 337 (1987).[9]

---

[8]As the panel focused primarily on "effects," rather than "purpose," I address these two *Lemon* prongs out of order.

[9]For example, the panel asserts that Arizona parents are presented with a choice that "deliberately skew[s] incentives toward religious schools."

I must confess that I am at a loss to understand how a reasonable observer—one fully informed about all matters related to the program—could conclude that the "*government itself*" has endorsed religion in this case. Multiple layers of private, individual choice separate the state from any religious entanglement: the "*government itself*" is at least four times removed from any aid to religious organizations. First, an individual or group of individuals must choose to create an STO. Second, that STO must then decide to provide scholarships to religious schools. Third, taxpayers have to contribute to the STO in question. Finally, parents need to apply for a scholarship for their student. In every respect and at every level, these are purely private choices, not government policy. Under such circumstances, "government cannot, or at least cannot easily, grant special favors that might lead to a religious establishment." *Zelman*, 536 U.S. at 652-53 (internal quotation marks and citation omitted). Only after passing through choice piled upon choice do government funds reach religious organizations. That is not government endorsement: that is government nonchalance.[10]

---

*See Winn*, 562 F.3d at 1013 (quoting *Zelman*, 536 U.S. at 650). The actual quotation from *Zelman*, however, includes a key qualifier: it condemns only programs where "the *State* deliberately skewed incentives toward religious schools." 536 U.S. at 650 (emphasis added). Since only state action can violate the Establishment Clause, the panel's omission is telling.

[10]The panel makes much of the fact that *Zelman* discussed aid flowing "directly" to parents. I submit that the Supreme Court used such terminology for two reasons. First, that was the case before the Court: it had no reason to pontificate on systems involving additional levels of private choice. Second, the language emphasized that the voucher program did not involve constitutionally problematic "direct" aid to religious institutions.

The panel turns this language into a rallying cry to suggest that by filtering aid through multiple levels of private choice—rather than a single level—the state endorses religion. But that makes no sense. How can *increasing* the separation between state and religion result in heightened government endorsement?

To illustrate my point, consider the following hypothetical. Assume the exact statutory scheme embodied in Section 1089: anyone can create an STO, anyone can donate to an STO, and STOs can limit their scholarships to particular types of schools. Now imagine that only agnostics decide to create STOs. Imagine further that every STO refuses to provide tuition assistance to religious schools. In short, assume there is absolutely no money available for parents who want to send their children to a religious school. Would the parents be justified in accusing the *government* of depriving their children of school funds? Of course not.

The foregoing example plainly shows that in this case, any "endorsement" of religion arising from the disbursement of state funds to religious entities turns wholly and completely on the independent, uncoerced choices of private individuals. The system Arizona created could just as easily have resulted in a total dearth of funding for religious organizations as opposed to the surfeit allegedly available. This feast or famine is utterly out of the state's hands. It simply cannot be, as the panel claims, that the "scholarship *program* . . . skews aid in favor of religious schools." *Winn*, 562 F.3d at 1013 (emphasis added). The "program" does no such thing: any "skew[ing]" that occurs takes place because of private, not government action. It is axiomatic that such action cannot violate the Establishment Clause.

A

The panel however, believes that under this multi-tiered system, choice is the culprit, not the savior. After all, plaintiffs allege that it is "the choice delegated to taxpayers" which "channels a disproportionate amount of government aid to sectarian STOs [that] limit their scholarships to use at religious schools." *Id. Zelman*, the panel maintains, focused on parental choice. *Id.* at 1018. Here, however, that choice is purported impermissibly to be "constrained" by the decisions of taxpayers and STOs. *Id.* at 1016. In other words, the choices

of others deprive parents of their own "independent and private choice[ ]." *Id.* at 1013 (internal quotation marks and citation omitted). They might want to send their children to secular private schools, but scholarships are not readily available for that purpose. Moreover, the panel claims the alleged abundance of funds from religious STOs creates an incentive for these parents to enroll their children in religious schools. *Id.* at 1017-18. The panel therefore holds that Section 1089 "fails to provide genuine opportunities for . . . parents to select secular educational options for their school-age children." *Id.* at 1018 (internal quotation marks and citation omitted).

I admit that the panel's conclusion with respect to the purported lack of parental choice finds support in *Zelman*. The problem is, that support comes from Justice Souter's dissent, not the opinion of the Court. Several aspects of the majority's reasoning in that case make the *Winn* panel's conclusion infirm.

1

By focusing generally on the scope of parental choice, the *Winn* panel, like the *Zelman* dissent, is barking up the wrong tree. The question is not whether a parent's choice is somehow limited or constrained, the question is whether the *government* has somehow limited or constrained the choice.

In *Zelman*, Justice Souter accused the majority of allowing external factors to "influenc[e] choices in a way that aims the money in a religious direction." 536 U.S. at 703 (Souter, J., dissenting). Of the fifty-six private schools that participated in the Cleveland voucher program, he noted, forty-six were religious. *Id.* In his mind, this lack of a "wide array of private nonreligious options" suggested that any "choice" was not genuine. *See id.* at 703-06. Rather, he believed parents' decisionmaking process was skewed by "the fact that too few nonreligious school desks are available and few but religious

schools can afford to accept more than a handful of voucher students." *Id.* at 707. "For the overwhelming number of children in the voucher scheme," he concluded, "the only alternative to the public schools is religious." *Id.* He was not swayed by the fact that these constraints were unrelated to state action: "a Hobson's choice is not a choice, whatever the reason for being Hobsonian." *Id.* In sum, Justice Souter would have struck down the Ohio voucher program because parents' choice was influenced by factors beyond their control.

Obviously, Justice Souter's position did not carry the day. "That 46 of the 56 private schools now participating in the program are religious schools," the majority explained, "does not condemn it as a violation of the Establishment Clause." *Id.* at 655 (majority opinion). For one thing, the Court noted that the imbalance was not a function of government action. *See id.* at 656-57. Moreover, "[t]o attribute constitutional significance" to the availability of secular options, "would lead to the absurd result that a neutral school-choice program might be permissible in . . . some states [with a high concentration of secular schools], but not in other States [where religious schools are plentiful]." *Id.* at 657.[11] To avoid this absurdity, the majority held that "[t]he constitutionality of a neutral educational aid program simply does not turn on whether and why, in a particular area, at a particular time,[12] most private schools are run by religious organizations, or

---

[11]Earlier, I listed several state programs jeopardized by the panel's holding. *See supra* note 1. Under the panel's reasoning, those schemes could be constitutional if taxpayers decided to provide more funds to secular, rather than religious STOs. An identical program might then be constitutional in one state and unconstitutional in another.

[12]The "at a particular time" reference is especially significant. As discussed above, nothing in Section 1089 precludes any Arizona taxpayer, tomorrow, from suddenly deciding to fund exclusively secular STOs. *See supra* pp. 14709-11. The Supreme Court has twice declined to strike down laws on the basis of such moving targets. *See Zelman*, 536 U.S. at 657-58; *Muller v. Allen*, 463 U.S. 388, 401 (1983).

most recipients choose to use the aid at a religious school." *Id.* at 658.[13]

I see no meaningful distinction between the situation in *Zelman* and the facts of this case. Both cases involve alleged "constraints" on access to a scarce secular resource— "nonreligious [private] school desks." In *Zelman*, only ten of the participating schools were secular. *Id.* at 656. Parents were thus "constrained" by third-party decisions to fund religious, rather than secular schools. Here, while thirty out of fifty-five STOs offer scholarships to secular schools, the majority of program funds are allegedly concentrated in religious STOs. Parents are thus "constrained" by the decisions of some STOs to limit their scholarships to religious institutions, and taxpayer choices to direct their funds to those STOs. The key point is that in neither *Zelman* nor the case at hand are the purported "constraints" government-induced. There is simply no constitutionally significant distinction between a system where—for reasons unattributable to state action—money is available, but there are a limited number of schools to receive it, and a system where schools may be available, but there is a limited amount of money to spend. Under either scenario, as Justice Souter bemoaned, "[f]or the overwhelming number of children in the [program], the only alternative to the public schools is religious." *Id.* at 707 (Souter, J., dissenting).

I can go on. In *Zelman*, voucher funds could be used at participating public schools in districts adjacent to Cleveland. *Id.* at 645 (majority opinion). However, no such school "elected to participate." *Id.* at 647. Parental choice was therefore "constrained" by the decisions of out-of-district public school

[13]The Court went on to explain that it is "irrelevant . . . to the constitutionality" of a government aid program that "a vast majority of program benefits went to religious schools." *Zelman*, 536 U.S. at 658. The panel distinguishes this point, claiming that the *Zelman* did not involve a situation where parental choice was "constrained." *Winn*, 562 F.3d at 1017 n.14. As demonstrated below, that is simply not the case. *See infra* pp. 14728-31.

administrators. Similarly, Ohio did not require private secular schools to accept vouchers: they chose to do so. *See id.* at 656 n.4. Citing overcrowding or a desire for independence from government funds, these schools could just as easily have decided to opt out of the program. Alternatively, they could have, for whatever reason, decided to close up shop. In either scenario, parents again would be left with a reduced "choice" to send their children to private, secular schools. Did the *Zelman* Court strike down the Ohio program for impermissibly "delegating" such decisions to school administrators? Was parental choice held to be unduly "constrained"? Of course not. Instead, the Court said that the availability of a private secular education, "in a particular area, at a particular time," was irrelevant to the constitutional inquiry. *See Zelman*, 536 U.S. at 656-60; *supra* pp. 14728.[14]

Ultimately, the panel seems to assume that parents must have the same access to "nonreligious [private] school desks" as they do to religious private school desks. But that was certainly not the case in *Zelman*, and the Ohio voucher program was upheld. Indeed, such result is unattainable in *any* program where the government is neutral with respect to religion and nonreligion. If the government takes the constitutionally required hands-off approach, external factors will define the playing field. Contrary to the panel's conclusion, the constitutional inquiry "simply does not turn" on whatever influence these factors might exert on parents. *Zelman*, 536 U.S. at 658.

---

[14]The *Zelman* Court's comment that the "preponderance of religiously affiliated private schools certainly did not arise as a result of the [voucher] program" is also instructive. 536 U.S. at 656-57. The Court stated that the imbalance was "a phenomenon common to many American cities." *Id.* at 657. In other words, the disparity was caused not by government action, but rather by private predilections. The same can be said about the existence of religiously affiliated STOs and the disproportionate share of taxpayer contributions they receive. The concentration of funds in religious entities—and the resulting "constraint" on parental choice—"certainly did not arise as a result of" any state action, but rather as a consequence of private decisions. *See supra* pp. 14724-26.

Again, provided there is "no evidence that the *State* deliberately skewed incentives toward religious schools," there is no Establishment Clause violation. *Id.* at 650 (emphasis added); *see supra* pp. 14723-26. As the Arizona tax credit program is just as much a program of "true private choice" as the program in *Zelman*, 536 U.S. at 649, the panel erred in reinstating the constitutional challenge.[15]

2

In rejecting Justice Souter's position, the *Zelman* majority also emphasized that he was asking the wrong question. Rather than focusing narrowly on the challenged voucher program, the majority explained that the "Establishment Clause question is whether Ohio is coercing parents into sending their children to religious schools, and that question must be answered by evaluating *all* options Ohio provides Cleveland schoolchildren, only one of which is to obtain a [voucher]." *Id.* at 655-56. Because the *Winn* panel adopts Justice Souter's overly restrictive approach, rather than assessing "*all* options" available to Arizona students, its result is similarly flawed.[16]

Indeed, the panel overtly limited its parental-choice inquiry to "the range of educational choices the STO-administered scholarship programs offer." *Winn*, 562 F.3d at 1018. It "reject[ed] the suggestion that the mere existence of the public school system guarantees that any scholarship program provides for genuine private choice." *Id.* While the latter statement may be true, it is also something of a non sequitur. No one claims the existence of a public school system grants a

---

[15]For this reason, the *Winn* panel's reliance on *Committee for Public Education & Religious Liberty v. Nyquist*, 413 U.S. 756 (1973), is misplaced. *See Zelman*, 536 U.S. at 661-62.

[16]Interestingly, the Supreme Court decided to italicize "*all* options" in *Zelman*, and "*government itself*" in *Amos*. Maybe the justices thought these requirements were important. *Zelman*, 536 U.S. at 655-56; *Amos*, 483 U.S. at 337.

state license to ignore the Establishment Clause. The question, as *Zelman* instructs, is whether Arizona is "coercing parents into sending their children to religious schools," a question which must be answered by evaluating "*all* options" Arizona provides its schoolchildren. 536 U.S. at 655-56.

The panel did not even engage in this inquiry. Had it done so, it would have discovered that Section 1089 is but one of a "range of educational choices" available to parents of school-aged children. *Id.* at 655; *see also Kotterman*, 972 P.2d at 611 (noting that the "Arizona Legislature has, in recent years, expanded the options available in public education" and listing some of those options). Arizona's public schools must provide for open enrollment, allowing parents to send their children, tuition-free, to schools of their choice. Ariz. Rev. Stat. Ann. § 15-816.01(A). Tax credits are available for donations to public schools for "extracurricular activities or character education." Ariz. Rev. Stat. Ann. § 43-1089.01. An extensive system of charter schools "provide[s] additional academic choices for parents and pupils." *Id.* § 15-181.[17] Homeschooling is permitted and protected. *Id.* §§ 15-745, 802-03. Indeed, Section 1089 itself offers parents yet another alternative: they can create their own STO and solicit donations for use at secular private schools. These alternative educational opportunities mirror those the Court took into consideration in *Zelman*. *See* 536 U.S. at 655 ("Cleveland schoolchildren enjoy a range of educational choices: They may remain in public school as before, remain in public school with publicly funded tutoring aid, obtain a scholarship and choose a religious school, obtain a scholarship and choose a nonreligious private school, enroll in a community school, or enroll in a magnet school.").[18]

---

[17]Out of the 4,000 plus charters schools across the country, 478 are in Arizona. *See* Arizona Charter Schools Association, http://www.azcharters.org/pages/schools-basic-statistics (last visited July 25, 2009).

[18]As the district court observed, parents are actually *dis*couraged from sending their children to private religious schools. "An Arizona student

This is no Hobson's choice. Far from "coercing" parents into sending their children to religious schools, Arizona provides a wide variety of secular alternatives. "Any objective observer familiar with the full history and context of [Section 1089] would reasonably view it as one aspect of a broader undertaking . . . ." *Id.* at 655. By shutting its eyes to the host of options available to Arizona parents, the panel's opinion directly conflicts with *Zelman*.[19]

B

As demonstrated by the foregoing arguments, the Arizona program provides parents with "true private choice." That established, the panel's discussion of taxpayer choice becomes surplusage. Indeed, is its curious focus on "taxpayer choice" an apt analogy at all? I suggest that *Winn*'s reliance on *Larkin v. Grendel's Den, Inc.*, 459 U.S. 116 (1982), is utterly mistaken.

The thrust of the panel's reasoning is that taxpayer choice

---

may attend any public school without cost . . . . In contrast, the average scholarship paid by STOs in 2003 was $1,222, a sum unlikely to cover all of the costs of private school attendance." *Winn*, 361 F. Supp. 2d at 1121 (citations and footnote omitted); *see also Zelman*, 536 U.S. at 654 ("Families . . . have a financial disincentive to choose a private religious school over other schools. Parents that choose to . . . enroll their children in a private school . . . must copay a portion of the school's tuition. Families that choose a community school, magnet school, or traditional public school pay nothing. [This] clearly dispel[s] the claim that the program creates financial incentives for parents to choose a sectarian school." (internal quotation marks, alterations, and citation omitted)).

[19]The concurrence argues that this reading of *Zelman* is inconsistent with *Nyquist*. Concurrence at 14712-13. The Court invalidated the New York tax program at issue in *Nyquist* because its tuition reimbursements were designed " 'explicitly to offer . . . an incentive to parents to send their children to sectarian schools.' " *Zelman*, 536 U.S. at 662 (quoting *Nyquist*, 413 U.S. at 782-83). As I have explained above, the plethora of choices available to Arizona parents demonstrates that Section 1089 has no effect of incentivizing religious schools over sectarian schools.

is not a valid substitute for the *parental* choice allegedly at the core of *Zelman*. I am not certain, however, that parental choice was as central to the reasoning of *Zelman* as the panel would have it. While that opinion does repeatedly refer to aid "recipients," *see Winn*, 562 F.3d at 1018 (listing citations), at other times, it refers only to private, nongovernmental choice, *see, e.g.*, *Zelman*, 536 U.S. at 649 (describing programs where "government aid reaches religious schools only as a result of the genuine and independent choices of private individuals"); *id.* at 655 (stating that "no reasonable observer" would find government endorsement where "state aid reaches religious schools solely as a result of the numerous independent decisions of private individuals"). Significantly, *Zelman* seems most concerned about preventing the state from reaching out to "grant special favors that might lead to a religious establishment." *Id.* at 652-53 (internal quotation marks and citation omitted). So long as "favors" are doled out independent of state action, the Establishment Clause—which again, prohibits the "*government itself*" from endorsing religion—is not offended.

I further submit that under the endorsement test, any level of attenuation between government action and aid to religion necessarily reduces the likelihood that a "reasonable observer" will find impermissible government approbation. There can be no doubt that taxpayer choice contributes to that attenuation. Thus, the panel's analysis of whether the choice Section 1089 provides to taxpayers ensures that " 'the circuit between government and religion was broken' " is beside the point. *Winn*, 562 F.3d at 1021 (quoting *Zelman*, 536 U.S. at 652). The self-evident fact is that by "delegating" the choice to taxpayers, the government already broke the circuit.

Nonetheless, the panel contends a reasonable observer would consider two factors when deciding whether a program of individual choice violates the Establishment Clause: the "role the person making the choice occupies in the structure of the program," *id.* at 1020, and "whether the choice dele-

gated . . . has the effect of promoting, or hindering, the program's secular purpose," *id.* at 1021. Regarding the former, the panel determined there was "no 'effective means of guaranteeing' " that taxpayers would exercise their choice " 'exclusively for secular, neutral, and nonideological purposes.' " *Id.* at 1020 (quoting *Larkin*, 459 U.S. at 125). Parents, on the other hand, have "incentives to apply the program's aid based on their children's educational interests instead of on sectarian considerations." *Id.* at 1021. As for the latter, the panel concluded that taxpayers thwarted the secular purpose of the statute insofar as their contributions narrowed the range of available educational alternatives. *Id.* at 1022.

One could see how a reasonable observer in *Larkin* could perceive government endorsement of religion from the "role the [entity] making the choice" played in the scheme. Maybe I am stating the obvious, but a large part of that perception might rest on the fact that in *Larkin*, the state delegated legislative authority—the ability to veto liquor licenses—to *churches*. *See* 459 U.S. at 125. I say again: churches. Under such circumstances it is completely unsurprising that a reasonable observer would conclude that this "joint exercise of legislative authority by Church and State provides a significant symbolic benefit to religion in the minds of some." *Id.* at 125-26. To what pervasively sectarian organization has Arizona "delegated" the choice at issue in this case? The Arizona taxpayer.[20] When perceived endorsement of religion is at issue, state cooperation with churches is a far cry from state cooperation with taxpayers.[21]

---

[20]Additionally, the authority delegated in *Larkin* was absolute veto power in an area of traditional government functioning. 459 U.S. at 125. Here, each individual taxpayer exercises only a modicum of control over the allocation of scholarship funds.

[21]*Board of Education of Kiryas Joel Village School District v. Grumet*, 512 U.S. 687 (1994), does not support the panel's analysis. In *Larkin*, legislative authority was delegated to churches. In *Kiryas Joel*, the state created a school district such that a particular religious group would have "exclusive control of the political subdivision." 512 U.S. at 698-99. Both actions displayed overt religious bias. "Delegation" to the Arizona taxpayer does not.

Moreover, I disagree with the panel's conclusion that parents are somehow less motivated to promote religious objectives than taxpayers generally. As anyone who has grown up in a religious household will tell you, schooling decisions are as frequently made on the basis of *religious* considerations as they are on purely secular academic grounds. At the very least, sectarian considerations factor into the equation of what is in the child's best interests educationally. Thus, whether it resides with the taxpayer or the parent, once the choice is made available, the state has no "effective means of guaranteeing" that it will be exercised "exclusively for secular, neutral, and nonideological purposes." *Id.* at 125 (internal quotation marks and citation omitted). By contrast with engaging in pseudo-psychological inquires into motivation, under *Zelman*, we need only satisfy ourselves that the choice, whatever it is, is made by a private actor, not by the government.

With respect to taxpayers' ability to "thwart" the secular purpose of the statute, as discussed above, actors in *any* program of true private choice will have this ability. *See supra* pp. 14728-30. In *Zelman*, for example, the purpose of providing a broad range of educational opportunities was "thwarted" by the decisions of neighboring public-school administrators to decline program vouchers. *See supra* pp. 14729-30. The goal could be similarly "thwarted" if secular private school administrators decided to pull out of the program. *See supra* pp. 14729-30—. An inherent reality of true private choice programs cannot condemn Section 1089.

Ultimately, the panel appears to argue that Arizona's scheme is flawed because it essentially delegates to a private entity something the state could not constitutionally achieve by the exercise of its own powers; here, the promotion of religious education. *See Winn*, 562 F.3d at 1020; *see also id.* at 1021 (citing *Norwood v. Harrison*, 413 U.S. 455, 465 (1973)). That may well be true, but as the panel's own citation indicates, for that to be the case, the state must somehow "*induce*,

*encourage* or *promote* private persons to accomplish what it is constitutionally forbidden to accomplish." *Norwood*, 413 U.S. at 465 (emphases added). At the risk of beating a dead horse, I repeat that the state here has done *nothing* to cajole parents, STOs, or taxpayers into supporting religious education. The state has simply said, if you donate to the STO of your choice, you get a tax credit. Such action in no way induces, encourages, or promotes private parties to aid religion.[22]

## IV

The panel also holds that plaintiffs have alleged facts suggesting Section 1089 was not "enacted for . . . [a] valid secular purpose." *Winn*, 562 F.3d at 1011 (internal quotation marks and citation omitted). The panel reaches this conclusion despite conceding that the statute is facially neutral with respect to religion. *See id.* at 1011-12. Nothing in the legislative history suggests that the driving force behind the bill was anything other than the desire to provide "equal access to a wide range of schooling options for students of every income level." *Id.*; *see also Mueller*, 463 U.S. at 395 ("A state's decision to defray the cost of educational expenses incurred by parents—regardless of the type of schools their children attend—evidences a purpose that is both secular and understandable."). Nonetheless, the panel maintains that plaintiffs could prove, based on how Section 1089 operates in practice, that this "secular and valid" purpose is a sham. *Winn*, 562 F.3d at 1011-12.

From its citation to *McCreary County v. ACLU*, 545 U.S.

---

[22]The concurrence asserts that "[t]he effect of these taxpayer choices . . . may be to *harm* the ability of aspiring scholarship recipients to obtain a scholarship available for use at a secular school." Concurrence at 14716. I fail to see how Section 1089—which permits tax deductions for gifts to both religious and secular scholarship funds—harms a student's ability to obtain a scholarship to a secular school.

844 (2005), the panel seems to argue that the very enactment of Section 1089 "bespoke" a religious purpose. *Winn*, 562 F.3d at 1012. But how can this be so? *McCreary* does say that government action can be so "patently religious" that its nonsecular nature is evident. 545 U.S. at 862. The examples provided, however, are situations where the state mandated Bible study, the teaching of creationism, and prayer in schools. *Id.* at 862-63. Setting up a tax credit program to provide scholarships to children generally is hardly of the same ilk.

To the extent the panel claims that the manner in which Section 1089 has been *implemented* reveals the stated secular purpose to be a sham, their arguments are similarly unpersuasive. First, the Supreme Court has recognized that a "legislature's stated reasons will generally get deference," deference only abandoned in "those unusual cases where the claim was an apparent sham." *Id.* at 864-65. Nothing in the plaintiffs allegations suggest this is one of those "unusual cases," and as setting up a tax credit program is not a "patently religious" act, there is nothing "apparent" about any purported sham. Second, the implementation inquiry centers on actions taken by the *government*. *See id.* at 862 (stating that the inquiry turns on the "traditional external signs that show up in the text, legislative history, and implementation of the statute, or comparable official act") (internal quotation marks and citations omitted); *id.* at 870-74 (questioning the government's newly proffered purposes after it altered a Ten Commandments display in an attempt to mitigate previously stated sectarian purposes). Here, the alleged impropriety arises from taxpayer, not government action. Third, the panel's holding turns on plaintiff's allegation that "in practice STOs are permitted to restrict the use of their scholarships to use at certain religious schools." *Winn*, 562 F.3d at 1012. But that result is apparent from the statute itself, which is satisfied so long as STOs provide scholarships to two or more schools, *see supra* note 5, a fact plaintiffs themselves recognize in their com-

plaint. That an STO may independently decide to limit its scholarships does not make a religious purpose "apparent."[23]

Ultimately, the crux of the panel's purpose holding turns on matters previously discussed under the effects prong: a non-secular purpose could be inferred from the fact that, at a given moment, the bulk of scholarship money is available only for use at religious schools. But as detailed above, money flows to religious institutions entirely at the whim of nongovernmental actors: taxpayers or STOs. The legislature could hardly have had the "purpose" of endorsing religion when it set up a plan that, for all it knew, could have resulted in absolutely no funding for religious entities. *See supra* pp. 14723-26. This moving target is irrelevant to the Establishment Clause inquiry. *See supra* pp. 14727-31.

V

The layer upon layer of private choice built into this program ensures that "the circuit between government and religion [is] broken." *Zelman*, 536 U.S. at 652. Try as it may, the panel cannot complete such circuit. Ultimately, nothing in the panel opinion grapples with the fact that Arizona does nothing to encourage, to promote, or otherwise to incentivize private actors to direct aid to religious schools. Nothing explains how "the *government itself* has advanced religion through its own activities and influence." *Amos*, 483 U.S. at 337. Nothing points to any "evidence that the *State* deliberately skewed incentives toward religious schools." *Zelman*, 536 U.S. at 650 (emphasis added). Nothing shows how Section 1089 enables Arizona to "grant special favors that might lead to a religious establishment." *Id.* at 652-53 (internal quotation marks and citation omitted).

---

[23]Additionally, any inquiry into purpose must look at context. *See McCreary*, 545 U.S. at 862, 864, 866. As discussed above, Section 1089 was enacted amidst a broader effort to increase alternative educational opportunities. *See supra* pp. 14730-33; *see also Kotterman*, 972 P.2d at 611.

But the three-judge panel can hardly be faulted for these omissions: it cannot manufacture what does not exist.[24] What does exist is a tax credit system that relies entirely on private choice. Individuals choose to create an STO. STOs choose to limit their funds to certain schools. Taxpayers choose to donate. Parents choose to apply for scholarships. In truth, *everyone* in Arizona has a choice—everyone except the government. No *reasonable* observer would think this lengthy chain of choice suggests the government has endorsed religion.

Because the three-judge panel's decision strays from established Supreme Court precedent, and because it jeopardizes the educational opportunities of thousands of children who enjoy the benefits of Section 1089 and related programs across the nation, I must respectfully dissent from our court's regrettable failure to rehear this case en banc.

---

[24]*Cf. Compassion in Dying v. Washington*, 85 F.3d 1440, 1446-47 (9th Cir. 1996) (Trott, J., dissenting from denial of rehearing en banc) ("No magician—not David Copperfield, not even Harry Houdini—can produce a rabbit from a hat unless the rabbit is in the hat to begin with. Moreover, if a hat does not contain such an animal, a magician cannot claim that anything he is able to produce from it is in fact a rabbit, no matter how sincere he may be or how great his forensic skills. All of this has something to do with basic physics.").

PRINTED FOR
ADMINISTRATIVE OFFICE—U.S. COURTS
BY THOMSON REUTERS/WEST—SAN FRANCISCO

The summary, which does not constitute a part of the opinion of the court, is copyrighted
© 2009 Thomson Reuters/West.